[Civil No. 2691.   Filed October 17, 1927.]

[260 Pac. 435.]

I. P. McBRIDE, HARRY THOMPSON, FRED STEGER, JAMES F. McDONALD, and FLOYD WILLIAMS, as Members of and Constituting the Arizona State Highway Commission of the State of Arizona, Plaintiffs, v. JAMES H. KERBY, as Secretary of State, of the State of Arizona, Defendant.

Messrs. Struckmeyer, Jennings & Strouss, for Plaintiffs.

Mr. John W. Murphy, Attorney General, Mr. Earl Anderson, Assistant Attorney General, and Mr. E. J. Flanigan, Mr. W. C. Fields, and Mr. C. R. Lynch, for Defendant.

LOCKWOOD, J.—This is an original application in this court for a writ of *mandamus* against James H. Kerby, as Secretary of State, to compel him to turn over to the petitioners, as the Arizona state highway commission, all data, records, and property of the state relating to the administration of the Motor Vehicle Laws of the state. The court issued the alternative writ, to which respondent answered, seeking to show cause why the writ should not be made permanent, and attempting to justify his refusal to comply with the demand of the highway commission. Petitioners demurred to his answer, and the matter was submitted to us on the demurrer. The facts appearing on the petition and answer thereto and the sufficiency of which to justify respondent in his action are questioned by the demurrer are substantially as follows:

The seventh legislature, at its regular session, passed chapter 78, Laws of 1925, commonly known as the Motor Vehicle Title Registration Act, which we shall hereinafter refer to as chapter 78. This act provided for a system of motor vehicle title registration, and various other matters, and placed the administration thereof in the hands of the Secretary of State. The eighth legislature, at its regular session, passed chapter 99, Laws of 1927, hereinafter referred to as chapter 99, which, after the title and enacting clause, reads as follows:

"Section 1. That chapter 78, Session Laws 1925, be and the same is hereby repealed."

No affirmative legislation was included in chapter 99. Within the time allowed by law a referendum petition in proper form was filed against chapter 99. Thereafter the eighth legislature, at its Fourth Special Session, passed House Bill No. 2, known as the Highway Code. This Code was passed as an emergency measure August 11, and was on the same day approved by the governor and filed in the office of the Secretary of State. It is extremely voluminous and was evidently intended to provide a complete code for the construction and maintenance of the state highways, the regulation of motor vehicles using such highways, and the providing of revenue for the various necessities of the state highway department. It repeals many sections of the Revised Statutes of 1913 and the Session Laws since that time, both directly and by implication, and among them chapter 78, *supra,* and affirmatively places in the hands of the highway commission the authority given the Secretary of State under chapter 78.

It is the contention of respondent that the filing of a referendum against chapter 99, *supra,* had the effect of suspending the right of the legislature, pending the referendum, to adopt any legislation which would conflict with any of the provisions of chapter 78, the latter being the statute repealed by the referred chapter. Since the provision of the Highway Code under which petitioners claim they are entitled to the possession of the records in question obviously does conflict with chapter 78, if the legal position of respondent is correct the demurrer should be overruled; otherwise it should be sustained.

The question is one of great importance, involving as it does the meaning of the referendum provisions of the Constitution. Counsel agree there are but four precedents in the United States on the matter. In the case of *State ex rel. Megnella* v. *Meining,* 133

Minn. 98, 157 N. W. 991, an ordinance regulating "jitney" auto service was referred, and the city authorities, before the referendum election, repealed the referred ordinance and adopted another to the same general effect but differing in substantial details. It was held not a violation of the referendum provision. There was no discussion of the general principles involved, but merely a flat statement that the council could not have passed an ordinance essentially like the referred one, but could pass one covering the same subject matter as long as it differed materially. In *Ex parte Statham*, 45 Cal. App. 436, 187 Pac. 986, a very similar situation existed, and the court, again without attempting to make a logical analysis of the situation, approved the right of the council to pass the second ordinance, on the authority of the Megnella case, *supra*, but added that it might be that by use of the emergency clause the referred ordinance itself could be repealed and re-enacted *verbatim*, notwithstanding the referendum.

*Leach* v. *State*, 17 Okl. Cr. 322, 188 Pac. 118, holds only that:

"After the date at which an election is held on a referred measure, *although such election be held to be invalid*, a subsequent Legislature was authorized to consider the act referred" to "as having been rejected, and to propose and pass appropriate legislation upon the same subject. . . . " (Italics ours.)

The Megnella case, *supra*, was discussed, and the statement therein that the legislative body could not put into effect a law exactly similar to the referred law was mentioned, but the Oklahoma court neither approved nor disapproved it specifically. It is evident that this case is not in point on the facts, nor indeed can we gain any light on the general issue therefrom.

We come, then, to the case of *State* v. *Becker* (Mo. Sup.), 240 S. W. 229. This case is fairly in

point and is the only one in which there is a definite and sustained attempt to meet the issue herein presented by logical reasoning. The court was divided, four judges approving the majority view and three the minority. The opinion and reasoning of the majority fully supports the contention of respondent; that of the minority equally upholds the claim of petitioners. In view of this situation we think we are conservative in stating that there is, as yet, no rule on the subject, at least to the extent that there is a preponderant and well-reasoned line of decisions one way or the other. We therefore examine the matter as one of first impression, being guided by the specific language of our Constitution, the purpose apparently intended to be accomplished by the referendum provisions therein contained, the reasonableness and consistency of the different possible theories of interpretation, and the general rules of constitutional and statutory construction, more than by the precedents cited.

The constitutional provisions in regard to the referendum are found in article 4, section 1, of the Constitution. So far as pertinent to the subject under discussion, they read as follows:

"Section 1. (1) The legislative authority of the state shall be vested in a Legislature, . . . but the people reserve the power . . . to approve or reject at the polls any act, or item, section, or part of any act, of the Legislature. . . .

"(3) The second of these reserved powers is the referendum. Under this power the Legislature, or five per centum of the qualified electors, may order the submission to the people at the polls of any measure, or item, section, or part of any measure, enacted by the Legislature, except laws immediately necessary for the preservation of the public peace, health, or safety, . . . but to allow opportunity for referendum petitions, no act passed by the Legislature shall be operative for ninety days after the close of the session of the Legislature enacting such

measure, except such as require earlier operation to preserve the public peace, health, or safety. . . . .

"(5) Any measure or amendment of the Constitution proposed under the initiative, and any measure to which the referendum is applied, shall be referred to a vote of the qualified electors, and shall become law when approved by a majority of the votes cast thereon and upon proclamation of the Governor, and not otherwise.

"(6) The veto power of the Governor," or the power of the Legislature to repeal or amend, "shall not extend to initiative or referendum measures approved by a majority [vote] of the qualified electors. . . .

"(14) This section shall not be construed to deprive the Legislature of the right to enact any measure."

Let us consider the question first under the general rules of constitutional and statutory construction. There are certain well-accepted principles of which we state a few applicable to the present situation:

(1) If possible, constitutional provisions should be so construed as to make them all effective. *Clark v. Boyce*, 20 Ariz. 544, 185 Pac. 136; *State v. Osborne*, 14 Ariz. 185, 125 Pac. 884; 12 C. J. 707.

(2) The legislature has all power not expressly denied it or given to some other branch of the government. *State v. Osborne, supra; Clark v. Boyce, supra.*

(3) The object sought to be accomplished and the evils to be remedied by a constitutional provision must be constantly kept in mind. *Gibbons v. Ogden,* 9 Wheat. (U. S.) 1, 6 L. Ed. 23; *Jarrolt v. Moberly,* 103 U. S. 580, 26 L. Ed. 492.

(4) A construction which will result in an absurdity should be avoided. *Logan Co. v. Carnahan,* 66 Neb. 685, 92 N. W. 984, 95 N. W. 812; *Curry v. Lehman,* 55 Fla. 847, 47 South. 18; *Advisory Board of Coal Creek Tp. v. Levandowski* (Ind. App.), 84 N. E. 346; *In re Howard,* 80 Vt. 489, 68 Atl. 513.

What is it the people reserve the right to refer? According to the Constitution, it is "any measure, or item, section, or part of any measure, enacted by the Legislature." Now, legislatures do not ‧ enact general principles or subjects, nor indeed can they. The "measure" referred to by the Constitution can only be a definite, specific act or resolution. It may attempt to deal with a general principle, or it may not, but the "enactment" only applies to the precise language of the particular act, and no more. Such being the case, when a "measure . . . enacted by the Legislature" is referred to the people, by every principle of common sense the reference is of the particular definite act and the specific law established thereby, and not, by implication, of some general principle which it may be imagined is approved therein, much less some act other than the one referred. Such is always and necessarily the language of the petition of reference. Paragraph 3323, Revised Statutes of Arizona Civil Code, gives its form and requires the measure to be referred by designating its title, or, if the reference is of a part of an act, that the exact language referred be set up. Nowhere in the Constitution or the statute will be found the slightest suggestion that there is a reference of a general principle, or of an act mentioned by the referred act. We think there can be no escape from the conclusion that the reference is of the specific measure and nothing more.

But what is the effect of the reference? Again the Constitution is explicit on that point:

"Any measure . . . to which the referendum is applied, shall be referred to a vote of the qualified electors, and shall become law when approved by a majority of the votes cast thereon . . . *and not otherwise.*" (Italics ours.)

In other words, the vote of the legislature approving the particular measure referred is nullified, and

*that particular measure can* only become a law when approved by the voters. Nowhere in the Constitution can be found even a suggestion that a referendum petition has any effect except the nullification of the particular measure referred until its approval by the voters, which inferentially would leave the legislature in full possession of all other ordinary constitutional powers.

But the people apparently were not satisfied with mere silence on this point. In subdivision 14 of section 1, *supra,* it is expressly stated that:

"This section shall not be construed to deprive the Legislature of the right to enact any measure."

The only conceivable purpose of such language is to deny the very contention made by respondent. It does not refer to ordinary legislation not involved in an initiative or referendum, for no one would imagine on *any* theory "this section" affected such rights. It does not apply to initiated or referred measures *approved* by the voters for subdivision 6 expressly deprives the legislature of the right to enact measures affecting *them.* It must then refer to the only class of measures left—those affecting matters contained in acts referred to, but not approved or yet passed on by the voters. Taken into consideration with subdivision 5, the only logical and consistent interpretation is that when an act of the legislature is referred, *that particular act* is suspended in its operation, but that such *suspension* does not deprive the legislature of the right thereafter to pass, in the legal manner any measure it may deem advisable, notwithstanding such measure may deal with exactly the same subject as the referred act, and in the same manner, but subject, of course, to the same right of reference as was the original act. This construction is sustained by the language of subdivision 6, as amended in 1914. By such amendment

the power of the legislature to alter any legislation *approved* by the voters at the polls, generally upheld by the construction of similar constitutional provisions elsewhere, was expressly taken away. Had it been the intent of the voters to deny also the right to alter legislation merely referred but not yet approved, it is but reasonable to believe the amendment would have been worded accordingly.

In fact, counsel for respondent do not argue very seriously that the language of the Constitution, taken in its ordinary sense, would sustain their position, but devote most of their effort to show that to allow the legislature to again consider and legislate upon a subject once referred to the people, until the latter had voted on such reference, would violate not so much the letter as the spirit of the referendum clauses of the Constitution, and, to use their own language, "strike at the very root of the principles of democratic government, particularly principles embodied in the Constitution of the state of Arizona." If such is indeed the result of a denial of respondent's position, we would search long and earnestly for some legal method by which that calamity might be averted. This court yields to none in its devotion to and support of the liberal provisions of our Constitution. The writer of this opinion was one of the first to urge publicly, long before the adoption of that Constitution, that the principles of the initiative and referendum were vital to government by the people, and that they must become a part of the fundamental law of the new state.

After careful consideration of the briefs and arguments, however, we are inclined to think that an approval of respondent's contention would be far more likely to result in a control of our government by a few selfish interests, and a denial of the real will of the people, than would be a contrary holding,

and we shall endeavor to give our reasons for such belief.

Let us first examine the evils which the initiative and referendum were meant to meet, and then the remedy. It is well known that in the past many of our American legislatures were suspected, more or less justly, of being guided rather by the selfish wishes of the few than the true good of the many. It was claimed, and with much show of reason, that the powerful financial interests of the different states were able either to purchase or browbeat enough legislators to secure the passage or defeat of any measures they desired, and that the real will of the people was being nullified. While initiative and referendum legislation has been known ever since the dawn of popular government, it was not until the early part of this century that it was seriously urged in America as a remedy for the evils above mentioned, and it is to the state of Oregon that credit is due for its first practical application on a large scale in our country. Briefly summarized, the idea back of this remedy was that if the people had the right to prevent a bad law taking effect until they had approved it, it would be a waste of money for selfish interests corruptly to force it through the legislature, while if the people could also by their own action present and adopt affirmative statutes independent of the legislature, it would be equally futile for those interests to oppose any laws wished by the voters. In this way the purity of legislatures would be improved, and above all the people could prevent or adopt any laws they pleased, regardless of the actions of their representatives.

We think it will not be questioned that any system which preserves this right unimpaired, to wit, the right of the people to adopt or to prevent any legislation they wish, complies with the spirit of the initiative and referendum, and that this was the pur-

pose of our electors when they placed these provisions in the Constitution. With this in view as the end to be accomplished, let us examine the two theories of construction presented to us, and see which, in its practical workings, will best secure the desired result.

We will first consider respondent's contention. His claim is that when once a referendum is filed, the legislature is helpless to pass any legislation which will accomplish directly or indirectly any part of the result which would be produced by the referred measure until the people have voted on the matter. Let us apply this position to the present situation. Chapter 78 is quite voluminous and contains many provisions affecting the method of establishing title to motor vehicles. Chapter 99 repealed this *in toto* without substituting anything therefor, and was referred to the people. According to respondent, even though an admittedly vital defect might now be discovered in chapter 78, which only affected one part of that law, the unanimous legislature, with the approval of the governor and the acquiescence of the entire electorate, cannot change one single clause of the law till after the next general election, for it must be inferred from the fact the people referred a law entirely repealing chapter 78 that they wanted it to stand without change till that time at least. Is this reasonable? Carry the argument one step further. What is the situation should the voters at the polls fail to approve the repealing law? There are but two possible answers: First, it may be held that by failing to approve the repealing law they have in effect approved chapter 78, and under subdivision 6, *supra,* that chapter has the same effect as if it had been initiated, and is forever beyond the power of the legislature to modify in the slightest degree, notwithstanding at the election the electors were never told they were passing on the merits of chapter 78 or that

a failure to approve its repeal would establish every clause therein permanently, beyond the power of amendment by the legislature. Even counsel for respondent do not claim this would be the effect of a disapproval of the referred act. The only other alternative is that chapter 78 would then be subject to repeal, either *in toto* or in part, by the legislature. In other words, when 5,000 voters refer the repeal to the people, on the theory that chapter 78 should not be repealed but should stand, the hands of the legislature are tied; but as soon as 50,000 voters say "We agree with you; chapter 78 should not be repealed," by that *refusal* to approve the repeal the legislature is immediately given the right to *repeal* it, the very thing the voters have said they do not want done, and which it could not do until they had *refused* permission to do it. It seems to us that the mere statement of such a doctrine refutes itself; and yet in response to a written question by this court on this very point, counsel for respondent have in their supplemental brief stated this to be their position.

On the other hand, let us consider the opposite theory and its practical workings. An act is adopted by the legislature covering, let us say, the general subject of fraudulent conveyances in all its phases. It is in force for some two years, and the legislature for some reason repeals the law entirely. A referendum is promptly invoked against the repealing law, and by such act the effect of the latter is suspended until the next general election. The fraudulent conveyancing code remains, of course, so far as the repealing law is concerned, in full effect, and if the legislature acts no further it will so remain until the general election. If the people disapprove the repealing law the original statute continues in effect until altered in some other legal manner. If, on the other hand, they approve it, the original statute is then repealed. Let us suppose, however, that the members

of the legislature have discussed this question with their constituents after the reference of the repealing act, and have come to the conclusion that the objection was to the repeal of the law *in toto* with no substitute provided for it, and therefore when convened in special session, or even at the same session, they again pass a repealing law providing for a substitute for the original law. Or it may even be that they think they have convinced their constituents that an entire repeal of the law was advisable, and they pass a statute exactly the same as the first repealing statute. If the people in the interim have decided on second thought that the later action of the legislature is wise, no referendum petition will be filed, and the law will be repealed, not by authority of the *referred* repealing statute, but by the authority of the new and *unreferred* one. If, on the other hand, the electorate are of the same mind as they were in the first place, they have the same remedy as existed before, for there is no limitation to the number of referendums that may be filed, any more than there is a limitation to the number of statutes which may be passed, and again the will of the people has prevailed.

It seems to us that this contention comports much more with the true spirit of the referendum law than does that of respondent. Under his theory there is no provision for second thought either by the legislature or by the people, short of the next general election. No matter how the situation may have changed, no matter how the opinion of the public may have altered, both it and the legislature are helpless for nearly two years. On the other hand, on the theory of petitioners, room is given both parties for reconsideration. If both the legislature and the people persist in their original ideas the will of the people will always prove superior to that of the legislature, for no matter how many laws the legislature may

pass, the people always have 90 days from the time of the adjournment of the session of the legislature which passed the last act, in which to place their suspensive veto thereon, while in case the people have changed their minds, the evil existing in the opinion of the legslature may be remedied without delay.

Respondent's theory would establish the rule that the will of the people, once expressed, allows for no change of opinion for a fixed period. That of petitioners, to the contrary, while fully protecting every right of the voters to suspend an act of the legislature, allows them to alter their minds at any time. We have but recently passed through an actual situation which illustrates fully the dangers of respondent's position. The legislature at its regular session passed certain special acts for the construction of bridges. Shortly before the period for referendum had expired certain unknown interests, for reasons best known to themselves, desired to refer these laws, and petitions for referendums were placed in circulation and were quite liberally signed. The parties interested in these measures, however, on their discovery that these petitions were being circulated immediately secured widespread publicity both through court action and in the press in regard to their circulation, and it promptly appeared that many of those who had signed the petitions had done so under a misapprehension as to the real facts of the case, and desired to have their names withdrawn therefrom, while further signatures became almost impossible to get. The upshot of the whole matter was that for some reason or other the petitions were never filed, and the laws went into effect. Had the circulation, however, been delayed but a few days longer and the petitions filed at the last possible moment, under respondent's theory, even though every man who signed the referendum petitions had

joined in a request to the legislature to adopt acts similar to the referred acts, and even though the unanimous legislature and the governor had desired to do so, they would have been helpless until after the next general election. We think this practical example shows clearly that respondent's position, although apparently supporting the doctrine that the will of the people should prevail, actually tends to hamper the free exercise of such will far more than does the theory of petitioners.

It has been urged, however, that if we adopt petitioners' theory, the act may become a legislative football, the legislature passing and the people referring act after act, and that the expense of the reference in so many successive cases will be prohibitive. We do not think a situation in which the legislature repeatedly passes an act which has been several times referred by the people is likely ever to arise. Legislators as a rule are anxious to obey what they honestly believe to be the real wishes of their constituents, and we think it very unlikely that a legislature which had been told twice by its constituents they did not desire a certain law would dare to again pass it, especially when they knew that each passage could and would be suspended by another referendum. So far as the expense feature is concerned, if the law in question is really obnoxious to five per cent of the voters, the expense of each successive referendum would be negligible. The cost of preparing and printing petitions for a referendum amounts to but a few dollars at most. There is no fee charged either for the privilege of signing such petition or for filing it, and there would be no trouble securing volunteers to circulate it. The actual necessary expenses of such a referendum could not exceed $25 to $50, a very trifling sum, in our opinion, to pay to show that the electorate objects to the action of their own chosen representatives. If, on the other hand, as has often

been intimated, many of the referendums filed are not really desired by the voters at large, but by a very few selfishly interested parties who are forced to secure many highly paid solicitors in order to obtain, frequently by misrepresentation, enough signatures to comply with the law, we admit that the cost of such successive referendums would be high. Since we do not think the spirit of our referendum laws applies to referendums of this nature, however the letter may, the great expense incurred in such cases is not sufficient to cause us to set aside the plain language of the Constitution.

There is but one other objection which may be urged by respondent, which is that in the case at bar the people were not permitted to file a second referendum against the repeal of chapter 78, for the reason that the Highway Code carried the emergency clause and therefore was not subject to referendum. The answer to this is that the very people of the state who placed the referendum clauses in the Constitution expressly provided therein that no emergency measure should be subject to a referendum, and did not limit the legislature as to when an emergency should be declared. It may be that a mistake was made in giving the unlimited use of the emergency power to the legislature. That, however, is a matter which can be remedied by the people through an amendment to the Constitution at any time, but so long as it remains as it is, respondent cannot claim that the attachment of an emergency clause to a measure is an unauthorized thwarting of the will of the people.

To sum up, under petitioners' contention, the people may at all times prevent the going into effect of legislation establishing any particular law or legal principle, and not carrying the emergency clause, by the use of the referendum, while at the same time retaining the power, through the failure to invoke

that remedy, of changing their minds in regard to their previous action without the necessity of waiting until the next general election; while under that of respondent, a referendum once filed denies the right of the people to alter their opinion for nearly two years. We think there can be no question that petitioners' theory of the referendum is far more consonant with the spirit of our Constitution and those principles of democratic government embodied therein and referred to by counsel for respondent.

For the foregoing reasons, the alternative writ of *mandamus* heretofore issued is made permanent.

ROSS, C. J., and McALISTER, J., concur.