REYNOLDS v BUREAU OF STATE LOTTERY

Docket No. 210973. Submitted September 15, 1999, at Grand Rapids. Decided March 3, 2000, at 9:05 A.M. Leave to appeal sought.

Brian Reynolds and Reynolds for Surveyor, a Michigan political candidate committee, brought an action in the Barry Circuit Court against the Bureau of State Lottery and the bureau's commissioner, seeking declaratory relief after the plaintiffs' application for a bingo license was denied by the defendants on the basis that the plaintiffs were not "qualified organizations" under subsection 3(6) of the Bingo Act, MCL 432.103(6); MSA 18.969(103)(6), as amended by 1975 PA 275. The plaintiffs alleged that the Legislature did not have the authority to enact 1975 PA 275. The plaintiffs' claim was based on the fact that before 1994 subsection 3(6) specifically provided that political candidate committees were among the qualified organizations that could be licensed to conduct bingo. Subsection 3(6) was amended by 1994 PA 118 to exclude all political committees from being licensed, effective April 1, 1995. After referendum petitions regarding 1994 PA 118 were filed with the appropriate state agencies and while the petition certification process and any related appeals were in progress, the Legislature enacted 1995 PA 275, effective January 7, 1996, which made minor changes to § 3 but encompassed all of § 3, including subsection 3(6), in substantially the same form as it had been enacted by 1994 PA 118. The Secretary of State then certified the referendum for the 1996 general election. The referendum was rejected, the majority of the voters voting against approving 1994 PA 118. The plaintiffs thereafter sought and were denied a bingo license. The court, James H. Fisher, J., granted declaratory relief in favor of the defendants, finding that the Legislature had the authority to enact 1995 PA 275 and that the validity of 1995 PA 275 was not affected by the referendum vote regarding 1994 PA 118. The plaintiffs appealed.

The Court of Appeals held:

1. The Legislature had the authority to pass 1995 PA 275 and thus reenact the provisions of 1994 PA 118 that was then subject to a referendum effort. The Legislature, in exercising its authority, did not undermine the referendum authority granted to the people by the state constitution.

2. A law referred to the people is rendered ineffective unless it is approved by a majority vote at the next general election. The law that is referred is a definite, specific act, such as 1994 PA 118 in this case. The constitution does not provide a general preemption of the field encompassed by the law referred that would prevent further legislative action regarding the issues raised by the referendum. When a law is referred, the Legislature remains in full possession of all its other ordinary constitutional powers, including legislative power over the subject matter addressed by the law referred.

3. The referendum right granted by the constitution was preserved in this case. The second legislation itself, 1995 PA 275, is subject to the right of reference.

4. A prior decision by another panel of the Court of Appeals does not operate as res judicata in this case because the prior decision did not address the merits of the issues advanced in this case.

Affirmed.

CONSTITUTIONAL LAW — REFERENDUMS.

The referral to the people of a law enacted by the Legislature concerns a particular, definite act and not the general principle or subject matter at issue in the act referred; the specific law referred is rendered ineffective unless it is approved by a majority vote at the next general election; the suspension of the operation of a referred act does not deprive the Legislature of the right thereafter, even before the referendum vote at the next general election, to enact in a legal manner any measure it may deem advisable, notwithstanding the measure may deal with exactly the same subject as the referred act and in the same manner, but the new measure is subject to the same right of reference as was the original act (Const 1963, art 2, § 9).

*Boyden, Waddell, Timmons & Dilley, P.L.C.* (by *Thomas F. Koernke*), for the plaintiffs.

*Jennifer M. Granholm*, Attorney General, *Thomas L. Casey*, Solicitor General, and *Keith Roberts* and *E. Michael Stafford*, Assistant Attorneys General, and *Dickinson Wright PLLC* (by *Peter H. Ellsworth* and *Jeffery V. Stuckey*), Special Assistant Attorneys General, for the defendants.

Amici Curiae:

*Jennifer M. Granholm*, Attorney General, *Thomas L. Casey*, Solicitor General, and *Gary P. Gordon* and *Katherine C. Galvin*, Assistant Attorneys General, for the Attorney General.

*Sachs, Waldman, O'Hare, Helveston, Bogas & McIntosh, P.C.* (by *Mary Ellen Gurewitz*), for B.I.N.G.O. (Bingo is Necessary for Grassroots Organization).

Before: BANDSTRA, C.J., and MARKMAN and METER, JJ.

BANDSTRA, C.J. At issue here is the power of the Legislature to reenact a law while a referendum process regarding that law is pending but before the general election deciding the referendum. Plaintiffs[1] claim that, in granting declaratory relief to defendants, the trial court improperly determined that the Legislature has this power. We conclude that the relevant constitutional provisions do not deny the Legislature this power and we affirm.

### STANDARD OF REVIEW

Matters of constitutional and statutory interpretation are reviewed de novo. *Oakland Co Bd of Co Rd Comm'rs v Michigan Property & Casualty Guaranty Ass'n*, 456 Mich 590, 610; 575 NW2d 751 (1998). This Court has articulated the standard for interpreting constitutional provisions as follows:

---

[1] We use the term "plaintiffs" here to mean plaintiffs and also the amicus parties, the Attorney General and B.I.N.G.O. (Bingo is Necessary for Grassroots Organization) (BINGO), both of which support plaintiffs' position on this appeal. The amicus parties were allowed to file briefs and to present oral argument regarding this matter because of the weighty constitutional issue presented.

When interpreting the constitution, the primary duty of the judiciary is to "ascertain as best the Court may the general understanding and therefore the uppermost or dominant purpose of the people when they approved the provision or provisions." *Michigan Farm Bureau v Secretary of State*, 379 Mich 387, 390-391; 151 NW2d 797 (1967). A constitutional provision must be interpreted in the "sense most obvious to the common understanding." *House Speaker v Governor*, 443 Mich 560, 577; 506 NW2d 190 (1993). [*Bingo Coalition for Charity-Not Politics v Bd of State Canvassers*, 215 Mich App 405, 409-410; 546 NW2d 637 (1996).]

Similarly, when interpreting statutes, our primary goal is to ascertain and give effect to the intent of the Legislature. *Frankenmuth Mut Ins Co v Marlette Homes, Inc*, 456 Mich 511, 515; 573 NW2d 611 (1998). Our first step in achieving that goal is to examine the language of the statute itself. *In re MCI Telecommunications Complaint*, 460 Mich 396, 411; 596 NW2d 164 (1999). If the language of the statute is clear, we presume that the Legislature intended the meaning it expressed. *Id.*

### FACTUAL BACKGROUND

To understand the question presented and to aid in its proper analysis, it is necessary to outline the underlying facts in some detail. Before 1994, subsection 3(6) of the Bingo Act, MCL 432.103(6); MSA 18.969(103)(6), specifically provided that political candidate committees were among the "qualified organization[s]" that could be licensed to conduct bingo. 1994 PA 118 amended the definition of "qualified organization" to specifically exclude all political committees, including candidate committees, effective April 1, 1995. In addition, this legislation increased the maximum payout allowed in a charity

game conducted in conjunction with a bingo game. MCL 432.107a; MSA 18.969(107a).[2]

The prohibition of bingo activity by political organizations was controversial and petitions for a statewide referendum on 1994 PA 118 were circulated. Approximately 85,000 signatures were collected before November 8, 1994, the date of the next general election, with approximately 155,000 collected after that election. *Bingo Coalition, supra* at 408-409. The referendum petitions were filed with the Secretary of State on January 31, 1995, and a dispute arose regarding the validity of the petition signatures that had been collected before the election. *Id.* The Secretary of State issued a declaratory ruling that all signatures on a referendum petition must be collected within a single election cycle, meaning that more than one-third of the signatures would not be counted. *Id.* at 408. The Board of State Canvassers addressed the validity of these petitions (and this declaratory ruling) and deadlocked, two members voting to uphold the declaratory ruling and two members voting to count the signatures obtained before the election along with those obtained after the election. *Id.* at 409. Our Court determined that the signatures collected before and following the general election should have been combined for purposes of determining the validity of the referendum petitions, in a decision issued on February 9, 1996. *Id.* at 414.

---

[2] We express no opinion concerning the continuing legal validity of the changes made by 1994 PA 118 to the maximum charity game payout provisions because that issue has not been raised by the parties. However, we note that these changes were part of the referendum that resulted in voter rejection of 1994 PA 118 in its entirety and also note that these changes were not included in 1995 PA 275, discussed below.

However, while the referendum petition certification and appeal were in process, the Legislature enacted 1995 PA 275. The only substantive[3] change made by this legislation was in the definition of "fraternal organization," to include organizations existing for a common "purpose" rather than a common "business." 1995 PA 275, MCL 432.103(2); MSA 18.969(103)(2).[4] However, the legislation encompassed all of § 3 of the Bingo Act including subsection 3(6) in substantially the same form as it had been amended by 1994 PA 118.

The Legislature gave 1995 PA 275 immediate effect, meaning that it became law on January 7, 1996, when it was signed by the Governor. Shortly thereafter, the Governor sent a letter to legislative leaders in which he opined that, notwithstanding the potential referendum vote on 1994 PA 118, the result of 1995 PA 275 was that political committees could not be granted bingo licenses because they were not "qualified organizations" under the Bingo Act. Accordingly, the Governor stated that, when current bingo licenses expired, political committees would be ineligible to renew those licenses.

As a result of the passage of 1995 PA 275, the appellant in *Bingo Coalition* moved to dismiss that appeal as moot, apparently arguing that this legisla-

---

[3] 1995 PA 275 also amended the subsection 3(6) definition of "qualified organization" but only by striking the "as amended" language in the references to the Single Business Tax Act and the Campaign Finance Act therein made. A similar change was made with respect to the "educational organization" definition's reference to the School Code. MCL 432.103(1); MSA 18.969(103)(1).

[4] This change apparently was requested to alleviate problems that certain fraternal organizations were having with the Internal Revenue Service. House Legislative Analysis, HB 5271, November 1, 1995.

tive act completely suspended the referendum process. Having already issued its February 9 decision on the merits of the appeal, our Court denied the motion to dismiss the appeal as moot in an order dated February 12, 1996. The order suggested no reason for that denial. *Bingo Coalition for Charity-Not Politics v Bd of State Canvassers*, unpublished order of the Court of Appeals, entered February 12, 1996 (Docket Nos. 183728, 183757). Similarly, our Supreme Court denied an emergency application for leave to appeal this Court's decision in this regard, stating only that "we are not persuaded that the questions presented should be reviewed by this Court." *Bingo Coalition for Charity v State Bd of Canvassers*, unpublished order of the Supreme Court, entered June 11, 1996 (Docket Nos. 105750, 105751).

After our Court's determination in *Bingo Coalition* that all signatures collected with respect to 1994 PA 118 should be considered, the Secretary of State certified the referendum for the 1996 general election. The referendum was rejected, the majority of voters voting against approving 1994 PA 118. Sometime thereafter, the instant plaintiffs filed an application for a bingo license. That application was denied by defendants on the basis of the statute as amended by 1995 PA 275.[5] Plaintiffs sought to overturn that result in an action for declaratory relief filed in the circuit court on March 9, 1998. The circuit court's decision

---

[5] Plaintiffs suggest that, for a time after 1995 PA 275 became law, the Bureau of State Lottery took the opposite position and licensed political committees for bingo operations. Plaintiffs, however, make no suggestion whatsoever of how or why this may be significant in any legal sense.

granting declaratory relief to defendants is the subject of this appeal.[6]

### ANALYSIS

With respect to referendums, our Michigan Constitution states in pertinent part:

> The people reserve to themselves . . . the power to approve or reject laws enacted by the legislature, called the referendum. . . . The power of referendum . . . must be invoked in the manner prescribed by law within 90 days following the final adjournment of the legislative session at which the law was enacted. To invoke the . . . referendum, petitions signed by a number of registered electors, not less than . . . five percent . . . of the total vote cast for all candidates for governor at the last preceding general election at which a governor was elected shall be required.
>
> No law as to which the power of referendum properly has been invoked shall be effective thereafter unless approved by a majority of the electors voting thereon at the next general election.
>
> *       *       *
>
> Any law submitted to the people by . . . referendum petition and approved by a majority of the votes cast thereon at any election shall take effect 10 days after the date of the official declaration of the vote. . . . Laws approved by the people under the referendum provision of this section may be amended by the legislature at any subsequent session thereof. [Const 1963, art 2, § 9.]

The primary question raised in this appeal is whether, under these constitutional provisions, the Legislature was without authority to pass 1995 PA 275 and thus

---

[6] At least one other political committee in a situation similar to plaintiffs' has filed an appeal with our Court. The instant matter was the first appeal filed with respect to the issues raised.

reenact the provisions of 1994 PA 118, that was then subject to a referendum effort. We conclude that the Legislature had this authority and that, in exercising it, the Legislature did not undermine the referendum authority granted to the people by our constitution.

We begin our analysis by considering our Supreme Court's decision in *Michigan Farm Bureau*. The question presented there was whether referendum petition signatures could be collected and filed before the adjournment of the legislative session in which the challenged law was enacted. *Michigan Farm Bureau, supra* at 391-392. At issue was a state statute that exempted Michigan from the national daylight saving time program. Absent the statute, that national program would have advanced official time forward one hour from the last Sunday in April until the last Sunday in October each year. *Id.* at 392. In that context, the Court reasoned that a construction of the constitution that prevented the gathering of signatures before the adjournment of the legislative session could completely eradicate the people's right to a referendum:

> The construction claimed here by plaintiffs would permit outright legislative defeat, not just hindrance, of the people's reserved right to test, by referendary process, the exemption made by Act No 6 or any like immediate-effect exemption the legislature might enact come the showers of April each year hereafter. To be specific: With such construction announced judicially, the legislature would stand free to avoid effective referral of this and future legislative exemptions . . . simply by repealing Act No 6 next November, then by enacting another immediate-effect act of exemption next spring and then by another repealer in the late fall, and so on through the years. [*Id.* at 394-395.]

In other words, our Supreme Court was concerned that, with respect to the rather unique legislative issue presented there, a contrary result would have meant that the people might never be afforded the referendum right to express at a general election their will with respect to an enacted law. That right might be defeated through repeated repeals[7] (and reenactments) of the unique seasonal legislation at issue

---

[7] Plaintiffs have referred to 1995 PA 275 as a "repeal" of 1994 PA 118. Nothing in 1995 PA 275 suggests that it is a repeal of the prior legislation. Instead, the later legislation included a reenactment of the subsection 3(6) provisions enacted in 1994 PA 118, as required by the constitution. Const 1963, art 4, § 25. Thus, the concern addressed by our Supreme Court in *Michigan Farm Bureau*, that the right of the people to bring a referendum could be defeated by repeal of the legislation beforehand, is not at issue here. Further, plaintiffs' characterization is not supported by statutory authority. "The provisions of any law or statute which is re-enacted, amended or revised, so far as they are the same as those of prior laws, shall be construed as a continuation of such laws and not as new enactments." MCL 8.3u; MSA 2.212(21). Admittedly, there is case authority that characterizes amended sections as repealed and reenacted. See *People v Kevorkian*, 447 Mich 436, 462; 527 NW2d 714 (1994); *Ballog v Knight Newspapers, Inc*, 381 Mich 527, 537-538; 164 NW2d 19 (1969); *People v Lowell*, 250 Mich 349, 355-356; 230 NW 202 (1930). However, there is also case authority that essentially repeats the rule of law found in MCL 8.3u; MSA 2.212(21). See *Perry v Hogarth*, 261 Mich 526, 530; 246 NW 214 (1933). The cases referring to repeal of legislation in an amendatory statute were not dealing with the specific issue before this Court. In the present context and considering *Michigan Farm Bureau*, we conclude that the people's right to a referendum vote would have been subject to legislative defeat if 1995 PA 275 was considered to be a repeal of 1994 PA 118. Consistent with our understanding of 1995 PA 275, in fact, 1994 PA 118 was subjected to referendum review at the 1996 general election as if it had not been repealed by 1995 PA 275. We express no opinion regarding the effect of later legislation that explicitly repeals a prior law that has been subject to the referendum process.

In a related argument, amicus curiae the Attorney General contends that MCL 8.3u; MSA 2.212(21) compels the conclusion that the language of 1995 PA 275 was nothing more than a continuation of 1994 PA 118. Although we do not disagree with this characterization, we disagree with plaintiffs' argument that, therefore, the referendum vote against 1994 PA 118 affected 1995 PA 275. We decline to find that a provision on statutory interpretation controls the way in which a constitutional provision must be interpreted. Moreover, for the reasons given in this opinion, we decline

there. The Court's ruling thus prevented "outright legislative defeat, not just hindrance, of the people's reserved right" to a referendum. *Id.* at 394.

Having arrived at this conclusion, the Court then proceeded to a very favorable discussion of *McBride v Kerby*, 32 Ariz 515; 260 P 435 (1927), overruled in part on other grounds *Adams v Bolin*, 74 Ariz 269; 247 P2d 617 (1952). *Michigan Farm Bureau, supra* at 395-396. Noting that the Arizona Constitution "corresponds in pertinent essence with ours," the Supreme Court quoted the Arizona court:

> "Nowhere in the Constitution can be found even a suggestion that a referendum petition has any effect except the nullification of the particular measure referred until its approval by the voters, which inferentially would leave the legislature in full possession of all other ordinary constitutional powers." [*Id.* at 396, quoting *McBride, supra* at 523.]

The Supreme Court summarized the *McBride* conclusion as being "that, after a measure has been referred and prior to the taking of the referendary vote, the legislature may—nay, must needs be left free to—legislate anew in the same area, subject always to the referral process should a sufficient numbers of electors petition therefor." *Michigan Farm Bureau, supra* at 396. The Court then "commend[ed] to our profession for application to" our constitution's referendum provisions the following passage from *McBride*:

> "Taken into consideration with subdivision 5, the only logical and consistent interpretation is that when an act of

to find that the referendum affected 1995 PA 275, even to the extent that the unamended provisions were a continuation of 1994 PA 118.

the legislature is referred, *that particular act* is suspended in its operation, but that such *suspension* does not deprive the legislature of the right thereafter to pass, in the legal manner any measure it may deem advisable, notwithstanding such measure may deal with exactly the same subject as the referred act, and in the same manner, but subject, of course, to the same right of reference as was the original act." [*Id.* at 396, quoting *McBride, supra* at 523 (emphasis in original).]

Of course, under familiar principles of stare decisis, this discussion of *McBride* would be decisive of the outcome of the present case without further analysis, unless that discussion is considered dictum. We agree with plaintiffs that the *Michigan Farm Bureau* discussion of *McBride* was dictum. The issue in *Michigan Farm Bureau* was not whether the Legislature may pass legislation identical to an act that is subject to the referendum process but, instead, whether signatures in support of a referendum petition may be gathered and filed before the end of the legislative session in which the challenged act was passed. In other words, the Court's statements in favor of *McBride* concerned "a principle of law not essential to determination of the case" and thus are "obiter dictum" without the "force of an adjudication." *Roberts v Auto-Owners Ins Co*, 422 Mich 594, 597-598; 374 NW2d 905 (1985).[8]

Nonetheless, having reviewed *McBride* closely, we, like our Supreme Court, are "impressed" with its reasoning. See *Michigan Farm Bureau, supra* at 395.

---

[8] Under this same analysis, we consider our Supreme Court's favorable citation of *Michigan Farm Bureau* with regard to this issue in *In re Proposals D & H*, 417 Mich 409, 421; 339 NW2d 848 (1983), a case dealing with the right to initiative rather than referendum, to be dictum.

The *McBride* court centered its analysis on the language of the constitution:

> What is it the people reserve the right to refer? According to the [Arizona] Constitution, it is "any measure, or item, section, or part of any measure, enacted by the Legislature." Now; legislatures do not enact general principles or subjects, nor indeed can they. The "measure" referred to by the Constitution can only be a definite, specific act or resolution. It may attempt to deal with a general principle, or it may not, but the "enactment" only applies to the precise language of the particular act, and no more. . . .
>
> . . . [W]hat is the effect of the reference? Again the Constitution is explicit on that point:
>
> "Any measure . . . to which the referendum is applied, shall be referred to a vote of the qualified electors, and shall become law when approved by a majority of the votes cast thereon . . . and not otherwise."
>
> In other words, the vote of the Legislature approving the particular measure referred is nullified, and that particular measure can only become a law when approved by the voters. Nowhere in the Constitution can be found even a suggestion that a referendum petition has any effect except the nullification of the particular measure referred until its approval by the voters, which inferentially would leave the Legislature in full possession of all other ordinary constitutional powers. [*McBride, supra* at 522-523.][9]

In Michigan, as in Arizona, courts interpret the constitution primarily by relying on the language used by its drafters, to find the "common understanding" of the "words employed." See, e.g., *Bolt v Lansing*, 459 Mich 152, 160; 587 NW2d 264 (1998); *House Speaker*,

---

[9] Plaintiffs point out that the *McBride* conclusion in this regard was buttressed by consideration of another section of the Arizona constitution without a counterpart within the Michigan Constitution. See *McBride, supra* at 523. However, we find the *McBride* analysis of the constitutional sections that are common to both constitutions to be persuasive in its own right.

*supra* at 577. Doing this, we come to a conclusion identical to that reached by the Arizona Supreme Court in *McBride*. According to the Michigan Constitution, the people reserve the right to refer "laws enacted by the legislature . . . ." Const 1963, art 2, § 9. The "law" referred to by our constitution can only be a definite, specific act, such as 1994 PA 118. Legislation may address a general principle or broad subject matter but, for referendum purposes, the "enacted law" is only the particular act supported by a majority of legislators and signed by the Governor, and no more.

Thus, when a "[law] enacted by the legislature" is referred to the people, the reference is of a particular definite act and not, by implication, the general principle or subject matter at issue in the act. The specific law referred, in this case 1994 PA 118, is rendered ineffective unless approved by a majority vote at the next general election. In other words, upon invocation of the referendum, the vote of the Legislature approving 1994 PA 118 was nullified and that particular act could become law only if approved by the voters.

However, nothing in the Michigan Constitution suggests that the referendum had a broader effect than nullification of 1994 PA 118. We cannot read into our constitution a general "preemption of the field" that would prevent further legislative action on the issues raised by the referendum. The Legislature remained in full possession of all its other ordinary constitutional powers, including legislative power over the subject matter addressed in 1994 PA 118. See Const 1963, art 4, § 1.

Plaintiffs try to avoid this result not by pointing to language in our constitution but, instead, by speaking broadly of the "right of referendum" and arguing that passage of 1995 PA 275 "extinguished" or "nullified" that right.[10] We disagree with this analysis. Plaintiffs correctly point out that, in *Michigan Farm Bureau,* our Supreme Court was concerned that the constitutional provisions regarding the right of referendum not be interpreted in a manner that would "permit outright legislative defeat" of that right. At issue in *Michigan Farm Bureau,* as discussed above, was a legislative scheme that hypothetically could have resulted in the people never being able to formally and officially express their will on a legislative action at the ballot box in a general election. See *Michigan Farm Bureau, supra* at 395. That is not the case here. The people had the right to go to the polls and register their opinion with regard to 1994 PA 118; they did so on November 5, 1996. Thus, the referendum right granted by the constitution was preserved. Plaintiffs would have us conclude that more is required by the constitution and that, in addition to protecting the right of the people to vote for or against an enacted law, we should restrict the Legislature from enacting

---

[10] A similar tack was taken in *McBride, supra* at 524:

> In fact, counsel for respondent do not argue very seriously that the language of the Constitution, taken in its ordinary sense, would sustain their position, but devote most of their effort to show that to allow the Legislature to again consider and legislate upon a subject once referred to the people, until the latter had voted on such reference, would violate not so much the letter as the spirit of the referendum clauses of the Constitution, and, to use their own language, "strike at the very root of the principles of democratic government, particularly principles embodied in the Constitution of the state of Arizona."

a separate law if that separate law would reenact some or all[11] of the same provisions contained in the referred law. For the reasons stated above, we cannot find this limitation on legislative power within the referendum language of our constitution.

This conclusion is buttressed by other constitutional language providing that "[l]aws approved by the people under the referendum provision . . . may be amended by the legislature at any subsequent session thereof." Const 1963, art 2, § 9; see *Advisory Opinion on Constitutionality of 1982 PA 47*, 418 Mich 49; 340 NW2d 817 (1983). Significantly, plaintiffs here do not contend that, following the 1996 rejection of 1994 PA 118, subsequent Legislatures would have been prevented from reenacting its prohibition of political committee bingo activity. We construe our constitution's provisions regarding the right of referendum as a whole and seek to harmonize them with each other. *Oakland Co Comm'r v Oakland Co Executive*, 98 Mich App 639, 647; 296 NW2d 621 (1980). We agree with defendants that it would be illogical to conclude that, while the Legislature could reenact the provisions of 1994 PA 118 after the voters had registered their rejection of that legislation at the polls, it was not authorized to do so before the election took place.

We reject plaintiffs' broad argument that our decision today will "nullify" the peoples' "right of referendum." Under *Michigan Farm Bureau*, once a law has been enacted, signatures in support of a referendum on that law may immediately be gathered and filed

---

[11] As noted earlier, 1995 PA 275 reenacted 1994 PA 118's provisions regarding political organizations and bingo operations but it did not include 1994 PA 118's charity gaming maximum payout provisions.

with the Secretary of State. Under *Bingo Coalition*, signatures gathered before ninety days after the legislative session in which the challenged law was passed may be counted, regardless of an intervening general election. These precedents protect the people's right to a referendum in the sense that they will result in a general election vote of the people if sufficient signatures are obtained, to provide the Legislature a clear indication of the popular will. That will be the result even if the Legislature has reenacted the challenged provisions in separate legislation not affected by the referendum, as allowed by our decision today.

The further result plaintiffs seek—a change in the law to implement the will of the people as evidenced at a general election referendum vote—can certainly be obtained; however, that will be a matter for political decision making rather than the automatic result of the general election vote. In the present case, for example, once the referendum vote had been taken, the Legislature could have responded to the expressed popular will by repealing 1995 PA 275, late in the 1995-96 session or in a following session. Failing to do that, legislators would be susceptible to election campaign criticism that they were grossly neglectful of the express will of the people.[12]

Further, should legislators not be responsive to the will of the people expressed at the referendum vote, the second legislation itself is " 'subject . . . to the same right of reference as was the original act.' " *Michigan Farm Bureau, supra* at 396, quoting *McBride, supra* at 523. In the present case, the Gov-

---

[12] Similarly, had the Legislature concentrated on the issue before us, there would no doubt have been much argument and debate about the propriety (and political wisdom) of passing 1995 PA 275 in the first place.

ernor's letter pointed out that approach by specifically noting that "the deadline to properly invoke the power of referendum on [1995 PA 275] is March 27, 1996." Although the appellants complain that this approach is unduly burdensome on the right to referendum, we agree with the reasoning of *McBride*:

> It has been urged, however, that if we adopt petitioners' theory, the act may become a legislative football, the Legislature passing and the people referring act after act, and that the expense of the reference in so many successive cases will be prohibitive. We do not think a situation in which the Legislature repeatedly passes an act which has been several times referred by the people is likely ever to arise. Legislators as a rule are anxious to obey what they honestly believe to be the real wishes of their constituents, and we think it very unlikely that a Legislature which had been told twice by its constituents they did not desire a certain law would dare to again pass it, especially when they knew that each passage could and would be suspended by another referendum. So far as the expense feature is concerned, if the law in question is really obnoxious to 5 percent of the voters, the expense of each successive referendum would be negligible. [*McBride, supra* at 530.]

We believe that our decision thus properly balances the people's right to a referendum with the political process that necessarily surrounds any public policy debate. We are leery of having the courts, in effect, dragged into that political process in the manner suggested by plaintiffs. For example, plaintiffs cite precedents from other states that allow further legislative activity with regard to an issue addressed by previous legislation that has become subject to a referendum, but only if the new legislation treats the issue in a "substantially different" manner, if the Legislature enacts the new legislation "in good faith" without the

purpose of subverting the referendum process,[13] or if there is some "emergency" which necessitates the new legislation. See, e.g., *In re Megnella*, 133 Minn 98, 99-100; 157 NW 991 (1916); *Ex parte Stratham*, 45 Cal App 436, 439-440; 187 P 986 (1920). *Ginsberg v Kentucky Utilities Co*, 260 Ky 60, 67-69; 83 SW2d 497 (1935). Under these approaches, courts would enter the political quagmire by being called on to determine whether the new approach taken by the Legislature was "substantially different" enough, whether the Legislature acted in "good faith," or whether a sufficient "emergency" existed. For the reasons that gave rise to the political question doctrine of judicial restraint, see, e.g., *Straus v Governor*, 230 Mich App 222, 225-226; 583 NW2d 520 (1998), aff'd 459 Mich 526; 592 NW2d 53 (1999), we conclude that these approaches are inappropriate.

We further note that the approach suggested by plaintiffs would allow a small number of petitioners (here about 155,000) to limit the power of a Legislature elected by all of Michigan's citizens. As noted by the trial court:

A ruling that 155,000 petition signers can tie the hands of the elected representatives of over nine million people would allow the will of the majority to be held hostage to the will of special interest groups. Clearly the drafters of

---

[13] We note that there was certainly no bad-faith attempt to subvert the referendum here. As noted below, the legislators apparently did not understand the potential effect their passage of the later legislation might have on the referendum process with respect to the earlier legislation. Further, at the time the Legislature approved 1995 PA 275, the referendum process was still being reviewed by our Court and whether sufficient petition signatures had been filed was not yet a settled question. Thus, the Legislature could not have acted with the intent of upsetting the results of a referendum vote that, at that time, was not certain to occur anyway.

our constitution would not have considered such a result to
be democratic.

In the absence of clear constitutional authority to
limit the representatives of the people from exercis-
ing the legislative power granted to them, we cannot
allow a minority to subvert that power.[14]

We thus conclude that remedial efforts aimed at
addressing the policy concerns raised by plaintiffs are
best directed to appropriate changes to the Michigan
Constitution. This is an exercise solely within the
province of the people through methods prescribed
by law and the judicial branch should not intrude into
this domain, invitations to the contrary notwith-
standing.

The other issues raised by plaintiffs require only
brief consideration. Amicus BINGO argues that plain-
tiffs are without standing to bring this action, but this
was not an issue raised by appellees (in a cross-
appeal) and it is not properly before us. MCR
7.212(H)(2). Appellants also argue that the decision
by another panel of our Court denying the appellants'
motion to dismiss the *Bingo Coalition* appeal as
moot should operate as res judicata with respect to
this appeal. One requirement for res judicata is that

---

[14] Plaintiffs argue that, in passing 1995 PA 275, the Legislature was not
aware of the effect its action would have on the referendum process with
respect to 1994 PA 118. We have no doubt that plaintiffs are correct in this
regard. There was no legislative debate whatsoever of this issue and the
vote in favor of 1995 PA 275  was unanimous. We are confident that the
legislative process and resulting vote would have been starkly different
had the effect on the referendum been considered. Nonetheless, this does
not disturb the result we reach today. The law presumes that the Legisla-
ture knows the legal ramifications of the actions it takes and those ramifi-
cations must be implemented even if, in fact, the Legislature did not know
the ramifications. See, e.g., *People v Ramsdell*, 230 Mich App 386, 392-393;
585 NW2d 1 (1998).

the prior case must have resulted in a decision on the merit of issues raised in the second action. *West Michigan Park Ass'n, Inc v Fogg*, 158 Mich App 160, 164; 404 NW2d 644 (1987). Apparently, the parties to *Bingo Coalition* agreed that our Court's decision regarding that motion to dismiss would be dispositive of the issues raised by the motion, and apparently, those issues were the same ones raised here. However, any such agreement is certainly not binding on this panel and we will not consider the order denying the motion, made without any reasoning provided, to be a decision on the merits of the issues advanced. This is especially the case because the denial of the motion occurred after the panel in *Bingo Coalition* had decided the merits of the issues raised on the appeal itself. Thus, it is likely that the panel simply denied the motion to dismiss as a matter of judicial economy, to avoid wasting the judicial resources that had been put into the determination of the issues raised on the appeal itself. In any event, the denial of the motion to dismiss could be construed as consistent with our opinion today. The panel in *Bingo Coalition* may well have recognized that passage of 1995 PA 275 was irrelevant with respect to whether the referendum on 1994 PA 118 should be placed on the general election ballot. Thus, the decision rendered on the merits in *Bingo Coalition*, that all signatures gathered before and after the general election could be considered, was not moot; it was necessary for the continuing referendum process.

We affirm.

METER, J., concurred.

MARKMAN, J., did not participate.