BINGO COALITION FOR CHARITY—NOT POLITICS v BOARD OF
STATE CANVASSERS

BINGO v BOARD OF STATE CANVASSERS

Docket Nos. 183728, 183757. Submitted January 3, 1996, at Detroit.
Decided February 9, 1996, at 9:05 A.M. Leave to appeal sought.

Bingo Coalition for Charity—Not Politics brought an action in
the Court of Appeals, seeking a writ of mandamus ordering the
Board of State Canvassers to hold that insufficient valid signa-
tures had been submitted with respect to a petition for a
referendum with respect to 1994 PA 118. B.I.N.G.O. (Bingo is
Necessary for Grassroots Organization) also brought an action
in the Court of Appeals, seeking a writ of mandamus ordering
the Board of State Canvassers to certify that sufficient valid
signatures had been submitted with respect to its petition for a
referendum with respect to 1994 PA 188. The actions were
consolidated. 1994 PA 118 was signed into law on May 12,
1994. B.I.N.G.O. began collecting signatures for its referendum
petition in August 1994 and collected 85,523 signatures before
the date of the general gubernatorial election on November 8,
1994. B.I.N.G.O. collected an additional 154,758 signatures
between the election and January 31, 1995, the date on which
it submitted its referendum petition to the Secretary of State.
The Bureau of Elections sampled the signatures and projected
that 1.2 percent of the potentially valid signatures would be
invalid, which would reduce the number of the signatures
secured after the election to less than that necessary for a
successful referendum petition. Following a declaratory ruling
by the Secretary of State that, pursuant to Const 1963, art 2,
§ 9, only the signatures secured after the 1994 gubernatorial
election could be used to determine whether adequate signa-
tures existed to call a referendum, the State Board of Canvass-
ers became deadlocked when two members followed the declar-
atory ruling and voted to exclude signatures collected before
the election, which would result in too few signatures to allow
certification of the referendum, and two members voted to

REFERENCES
Am Jur 2d, Initiative and Referendum §§ 38, 50.
See ALR Index under Initiative and Referendum.

count the signatures collected both before and after the election, which would result in the certification of the referendum. Thereafter, the actions for mandamus were filed.

The Court of Appeals *held:*

The language of Const 1963, art 2, § 9, when read in accordance with common understanding, does not suggest that referendum petitions circulated in a year of a gubernatorial election are subject to a special condition that all signatures must be collected either before or after the election. Rather, the language indicates only that the petitions must be filed within ninety days of the end of the legislative session at which the law was enacted and that the number of signatures must be not less than five percent of the total votes for governor in the last preceding election. Accordingly, because Const 1963, art 2, § 9 does not prohibit the gathering of signatures for a referendum petition both before and after a general gubernatorial election, the Board of State Canvassers has a clear legal duty to count signatures gathered both before and after the November 8, 1994, general election. B.I.N.G.O., as the proponent of the petition for a referendum, is a proper plaintiff to seek mandamus.

Writ of mandamus ordering the Board of State Canvassers to recount the petition signatures and vote again with regard to the certification of the referendum petition granted. Signatures gathered between May 12, 1994, and November 8, 1994, must be counted in the same manner as the signatures gathered after November 8, 1994.

MANDAMUS — BOARD OF STATE CANVASSERS — REFERENDUMS.

The constitutional provision dealing with referendums does not suggest that referendum petitions circulated in a year of a gubernatorial election are subject to a special condition that all signatures must be collected either before or after the election; accordingly, the Board of State Canvassers has a clear legal duty to count signatures gathered both before and after a general gubernatorial election, and mandamus is appropriate where the Board of State Canvassers fails to discharge that duty (Const 1963, art 2, § 9).

*Honigman Miller Schwartz & Cohn* (by *John D. Pirich, Timothy Sawyer Knowlton* and *Sandra L. Jasinski*), for Bingo Coalition for Charity—Not Politics.

*Sachs, Waldman, O'Hare, Helveston, Hodges &*

*Barnes, P.C.* (by *Theodore Sachs* and *Mary Ellen Gurewitz*), for B.I.N.G.O.

*Frank J. Kelley,* Attorney General, *Thomas L. Casey,* Solicitor General, and *Leo H. Friedman,* Assistant Attorney General, for the defendant.

Before: MCDONALD, P.J., and MARKEY and R. I. COOPER,* JJ.

PER CURIAM. B.I.N.G.O. (Bingo is Necessary for Grassroots Organization) and Bingo Coalition for Charity—Not Politics both filed complaints seeking writs of mandamus from this Court. The cases were consolidated and the matter proceeded to a full hearing pursuant to MCR 7.206(D)(3).

The issue to be determined is whether signatures gathered for a referendum petition must be collected within a single election cycle or whether signatures collected before a gubernatorial election may be counted with those collected after the election. The petition in question seeks a referendum with respect to 1994 PA 118, which prohibits the use of bingo games for political fundraising. B.I.N.G.O. is a proponent of the referendum and supports the eventual repeal of 1994 PA 118. Bingo Coalition for Charity opposes certification of the referendum petition.

Const 1963, art 2, § 9 reserves to voters of the state the power of referendum to approve or reject a newly enacted law:

> The people reserve to themselves the power to propose laws and to enact and reject laws, called the initiative, and the power to approve or reject laws enacted by the legislature, called the referendum. The power of initiative extends only to laws which the legislature may enact under this consti-

---

* Circuit judge, sitting on the Court of Appeals by assignment.

tution. The power of referendum does not extend
to acts making appropriations for state institutions
or to meet deficiencies in state funds and must be
invoked in the manner prescribed by law within
90 days following the final adjournment of the
legislative session at which the law was enacted.
To invoke the initiative or referendum, petitions
signed by a number of registered electors, not less
than eight percent for initiative and five percent
for referendum of the total vote cast for all candi-
dates for governor at the last preceding general
election at which a governor was elected shall be
required.

On May 12, 1994, Governor Engler signed 1994
PA 118, which was to take effect on April 1, 1995,
into law. The 1994 legislative session adjourned on
December 29, 1994. This gave B.I.N.G.O. until
March 29, 1995, to submit referendum petitions
signed by at least five percent of the total vote cast
in the last preceding gubernatorial election. See
Const 1963, art 2, § 9.

B.I.N.G.O. began collecting signatures in August
1994. On November 8, 1994, the date of the gen-
eral gubernatorial election, B.I.N.G.O. had col-
lected approximately 85,000 signatures. Following
the election, B.I.N.G.O. continued collecting signa-
tures and on January 31, 1995, submitted its
referendum petition to the Secretary of State.

Bingo Coalition for Charity requested a declara-
tory ruling from the Secretary of State stating the
signatures collected before the election could not
be counted. The Secretary of State issued a declar-
atory ruling, holding all signatures on a referen-
dum petition must be collected within a single
election cycle and, therefore, the 85,523 signatures
collected before the last election held on November
8, 1994, could not be counted.

After the November 1994 election, the required

number of valid signatures for a successful referendum petition, i.e., five percent of the total vote cast in the election, was 154,454. After the 85,523 signatures obtained before the November election were discounted, the petition contained 154,758 "potentially valid signatures," 304 signatures more than required. However, after the Bureau of Elections sampled the signatures and obtained a projection that 1.2 percent of the potentially valid signatures would be invalid, the valid number of signatures fell below those required. Thus, the referendum petition will fail if the 85,523 signatures obtained before the election are excluded. Following the Secretary of State's declaratory ruling, the Board of State Canvassers addressed the validity of the petition. Two members voted to follow the Secretary of State's declaratory ruling and exclude signatures collected before the election, while two members voted to count those signatures along with signatures obtained after the election.

Thereafter B.I.N.G.O. and Bingo Coalition for Charity filed the complaints for mandamus now before this Court.

We find a writ should issue requiring the Board of State Canvassers to include all signatures collected from the date 1994 PA 118 was enacted to March 29, 1995, ninety days following the final adjournment of the legislative session at which it was enacted.

Determination of this matter requires interpretation of Const 1963, art 2, § 9. When interpreting the constitution, the primary duty of the judiciary is to "ascertain as best the Court may the general understanding and therefore the uppermost or dominant purpose of the people when they approved the provision or provisions." *Michigan Farm Bureau v Secretary of State,* 379 Mich 387,

390-391; 151 NW2d 797 (1967). A constitutional provision must be interpreted in the "sense most obvious to the common understanding." *House Speaker v Governor,* 443 Mich 560, 577; 506 NW2d 190 (1993). This Court must also consider the circumstances surrounding the adoption of the provision, which may include consideration of the constitutional convention record and reference to existing law and custom at the time of the constitution's adoption. *House Speaker, supra,* pp 580-581.

In addition to the general rules for interpretation of the constitution, "constitutional provisions by which the people reserve to themselves a direct legislative voice ought to be liberally construed." *Kuhn v Dep't of Treasury,* 384 Mich 378, 385; 183 NW2d 796 (1971); *Farm Bureau Mutual Ins Co of Michigan v Comm'r of Ins,* 204 Mich App 361, Appendix A, 367; 514 NW2d 547 (1994). While this Court is to enforce strict compliance with constitutionally mandated procedures relating to the exercise of the referendum power, the Court must not "stretch" to limit the exercise of the power. *Kuhn, supra,* p 385.

No case decided under the 1963 constitution has addressed the effect of an intervening general election with respect to the validity of initiative or referendum petition signatures where signatures were collected before an election but the petition was filed after the election. However, Bingo Coalition for Charity argues *Hamilton v Secretary of State,* 221 Mich 541; 191 NW 827 (1923), a case addressing a similar issue, but decided under Michigan's 1908 constitution, should be applied to this matter. We disagree.

We do not believe the holding in *Hamilton* is applicable to this case that is subject to Const 1963, art 2, § 9. *Hamilton* interpreted the 1908

constitution's provision for constitutional amendment by initiative, which read in part:

> The total number of votes cast for Governor at the regular election last preceding *the filing* of any petition proposing an amendment to the constitution, shall be the basis upon which the number of legal voters necessary *to sign* such a petition shall be computed. [Const 1908, art 17, § 2 (emphasis added).]

In November 1922, after the general election, the plaintiff filed with the Secretary of State a petition for constitutional amendment. *Hamilton, supra,* p 543. Nearly all the signatures on the petition were obtained before the November 1922 election. However, because the voter turnout in November 1922 was approximately one-half of that in 1920, the number of signatures, insufficient if governed by the voter turnout of the 1920 election, became sufficient if governed by the voter turnout of the 1922 election. The Supreme Court refused to interpret the 1908 constitution to allow such a windfall and concluded an initiative petition "must be circulated after one election for governor and filed at least four months before another election for governor." *Id.,* p 546. In reaching this conclusion, the Supreme Court emphasized that Const 1908, art 17, § 2 stated the votes cast for governor in the "election last preceding the filing shall be the basis upon which the number of legal voters necessary *to sign* such a petition shall be computed." *Hamilton, supra,* p 547. The Court held "to sign" meant the required signature base must be determined *before* anyone signed the petition; thus, signatures obtained before the 1922 election could not be valid if the petition relied on the voter turnout of the 1922 election—"the regular election last pre-

ceding the filing"—to determine the number of required signatures. *Id.,* p 545.

Thus, the Court's decision in *Hamilton,* was based on the precise text of Const 1908, art 17, § 2. Although Const 1963, art 2, § 9 contains language similar to the 1908 provision addressed in *Hamilton,* it does not include the "to sign" language specifically relied on by the Court or the language specifying that the election be the "last preceding the filing." We therefore find *Hamilton* inapplicable. We also find that the silence of the delegates of the constitutional convention that considered the 1963 Convention does not support Bingo Coalition for Charity's position regarding this issue. The drafters of the constitution are presumed to have known the existing law and to have drafted the constitutional provision in light of that knowledge, *Syntex Laboratories Inc v Dep't of Treasury,* 188 Mich App 383; 470 NW2d 665 (1991). Here, the delegates did not use the same text as the 1908 provision discussed in *Hamilton,* and therefore, they did not manifest an intent to preserve the rule of *Hamilton.*

Bingo Coalition for Charity has failed to present any other evidence that the delegates intended referendum petitions filed in election years to be treated differently from those filed every other year. The interpretation suggested by the coalition would lead to such a result. The text of Const 1963, art 2, § 9 therefore stands on its own and must be read in accordance with "common understanding." There is no suggestion in Const 1963, art 2, § 9 that referendum petitions circulated in an election year are subject to a special condition that all signatures must be collected either before or after the election. Rather, the language indicates a specific period within which the petitions must be filed—"within ninety days following the

final adjournment of the legislative session at which the law was enacted"—as well as a method of determining how many signatures are required —not less than "five percent for referendum of the total vote cast for all candidates for governor at the last preceding general election at which a governor was elected."

In the present case, both B.I.N.G.O. and Bingo Coalition for Charity seek a writ of mandamus from this Court. Although they disagree concerning the desired result, both parties agree that the Board of State Canvassers has a clear legal duty to break its deadlock and either certify or refuse to certify the referendum petition.

The issuance of a writ of mandamus is discretionary with this Court. *Herp v Lansing City Clerk*, 164 Mich App 150; 416 NW2d 367 (1987). As this Court stated in *Tuscola Co Abstract Co, Inc v Tuscola Co Register of Deeds*, 206 Mich App 508, 510-511; 522 NW2d 686 (1994):

Issuance of a writ of mandamus is proper where (1) the plaintiff has a clear legal right to performance of the specific duty sought to be compelled, (2) the defendant has the clear legal duty to perform such act, and (3) the act is ministerial, involving no exercise of discretion or judgment.

The writ of mandamus has been used before to address questions of the interpretation of Const 1963, art 2, § 9. See *Wolverine Golf Club v Secretary of State*, 384 Mich 461; 185 NW2d 392 (1971); *Automobile Club of Michigan Committee for Lower Rates Now v Secretary of State (On Remand)*, 195 Mich App 613; 491 NW2d 269 (1992), complaint for mandamus granted 440 Mich 1209 (1992); *Newsome v Bd of State Canvassers*, 69 Mich App 725; 245 NW2d 374 (1976).

The Board of State Canvassers has a clear legal duty to act in accordance with Const 1963, art 2, § 9. Because Const 1963, art 2, § 9 does not prohibit the gathering of signatures for a referendum petition both before and after a general election, the board has a clear legal duty to count the signatures gathered between May 12, 1994, and November 8, 1994, in the same manner as the signatures gathered after November 8, 1994, the date of the last preceding general gubernatorial election. B.I.N.G.O., as the proponent of the petition, is a proper plaintiff to request the writ of mandamus. We therefore order the board to recount the petition signatures and vote again with regard to the certification of the referendum petition.

Finally, suspension of 1994 PA 118 was proper. A referendum petition that "on its face meets legal requirements" and appears to contain a sufficient number of valid signatures suspends the effectiveness of the law in question until the petition is found to be invalid or the people vote on the referendum. *Farm Bureau, supra,* p 368.

A writ of mandamus ordering the Board of State Canvassers to recount the petition signatures and vote again with regard to the certification of the referendum petition is granted. The signatures gathered between May 12, 1994, and November 8, 1994, must be counted in the same manner as the signatures gathered after November 8, 1994.