Cavanagh, J.
(dissenting). This case presents issues involving the Legislature’s constitutional authority and the authority of the people of Michigan — expressly *404 reserved in our 1963 Constitution — to vote on matters of great public significance. The statute in this case affects just such an issue of great public significance, involving the delicate balance between the free exercise of Second Amendment rights and the fundamental obligation of government to protect its citizens’ physical safety. Understandably, this case has energized opposing groups of citizens to a degree rarely seen in public debate.[1]
Similarly, this case has energized this Court, prompting each justice to offer an opinion. I join in and agree with the reasoning offered in the dissenting opinions by Justice Kelly and Justice Weaver. However, I offer this opinion to address my specific concerns with the majority’s decision.
The facts, which the actual majority opinion has neglected to recite to either explain its opinion or to serve future litigants as precedent, and which appear only in the seriatim concurrences, are not in dispute. For many years, Michigan has restricted citizens’ *405 rights to carry concealed weapons. To obtain a permit to carry a concealed weapon from a county concealed weapons board, a person has needed to demonstrate “proper reasons” to carry a concealed weapon. See MCL 28.426, repealed by 2000 PA 381. Under the former system, the popular perception was that the permits were difficult to obtain.
Proposed legislation to change this system was introduced in the 90th Legislature, but it had few prospects for approval. However, a legislative majority discovered new prospects after the November 2000 election, when the Legislature reconvened to conduct its biennial “lame duck” session.[2] In 2000 PA 381, the Legislature adopted what is popularly known as “shall issue” legislation, providing that county boards must issue concealed weapons permits to applicants when certain unremarkable conditions are met. See MCL 28.425b(7).
Despite the timing of its passage, this profound change in Michigan law did not go unnoticed. Opposition quickly formed, but to no immediate avail. However, opponents of the new law realized the great public interest in this measure, and the likelihood that Michigan citizens on both sides of the issue would want to make their views known. Therefore, opponents began publicly to discuss invoking the referendum process that the people of Michigan reserved for themselves in Const 1963, art 2, § 9.
In that constitutional provision, the people kept the right to vote on laws enacted by the Legislature. The people of Michigan have long reserved this right, first *406 providing for it in Michigan’s 1908 Constitution. See Const 1908, art 5, § 1. Recent examples of the people exercising this right occurred with the controversial legislation discussed in Doe v Dep’t of Social Services, 439 Mich 650, 658; 487 NW2d 166 (1992), and with the measures discussed in Bingo Coalition for Charity—Not Politics v Bd of State Canvassers, 215 Mich App 405; 546 NW2d 637 (1996).
The referendum power is not unlimited, however. The framers of the constitution — and the people of Michigan when they ratified the constitution — wisely limited the referendum power so that it would not “extend to acts making appropriations for state institutions . . .,” Const 1963, art 2, § 9. For obvious reasons, the state’s fulfillment of its financial obligations cannot be subject to the delay and uncertainty inherent in the referendum process. Indeed, as this Court has stated, the limitation is designed to “enable the State to exercise its various functions free from financial embarrassment.” Detroit Automobile Club v Secretary of State, 230 Mich 623, 625; 203 NW 529 (1925).
The concealed weapons legislation that is the subject of this suit acquired, late in the enactment process, some language that provided for a $1 million grant to the Michigan State Police. See MCL 28.425w. Intervening defendant People Who Care About Kids seeks to establish that the monetary provision of 2000 PA 381 will have no effect on the state’s ability to function normally, and is not necessary to save the state from financial embarrassment. Rather, intervening defendant suggests that the monetary provision of the act was added specifically to evade the people’s right to review the wisdom of the concealed weapons *407 provisions in that act.[3] That is, intervening defendant states that although 2000 PA 381 will fundamentally change Michigan law governing concealed weapons permits, a legislative majority acted with the specific intent to deny Michigan citizens their right to decide whether most people should be legally allowed to carry concealed firearms.
In answering this argument, the majority focuses narrowly on the superficially straightforward question whether 2000 PA 381 fits within the phrase “acts making appropriations for state institutions.” Ante at 365. As the reader has seen, the majority has no problem answering that question affirmatively, granting the lame-duck legislative majority the prize it apparently sought: freedom to change the concealed weapons law without public review through the referendum process.
Despite the legalistic temptation to focus on the seemingly literal language of a single phrase in a single sentence, the pertinent sentence here is but one sentence in our state constitution. Constitutional analysis must not be overly literal; it is an undertaking *408 that must be approached in an entirely different light. Long ago, Michigan’s great constitutional scholar Justice COOLEY set forth for his many successors on this Court the primary rule of constitutional interpretation, the rule of “common understanding,” described in his treatise Constitutional Limitations, p 81, to which this Court has turned so frequently. This Court gave a fully developed explanation of the rule in Traverse City Sch Dist v Attorney General, 384 Mich 390, 405-406; 185 NW2d 9 (1971):
This case requires the construction of a constitution, where the technical rules of statutory construction do not apply. McCulloch v Maryland, 17 US (4 Wheat) 316, 407; 4 L Ed 579 (1819).
The primary rule is the rule of “common understanding” described by Justice Cooley:
“A constitution is made for the people and by the people. The interpretation that should be given it is that which reasonable minds, the great mass of the people themselves, would give it. ‘For as the Constitution does not derive its force from the convention which framed it, but from the people who ratified it, the intent to be arrived at is that of the people, and it is not to be supposed that they have looked for any dark or abstruse meaning in the words employed, but rather that they have accepted them in the sense most obvious to the common understanding, and ratified the instrument in the belief that that was the sense designed to be conveyed.’ (Cooley’s Const Lim 81.) (Emphasis added.)”
A second rule is that to clarify meaning, the circumstances surrounding the adoption of a constitutional provision and the purpose sought to be accomplished may be considered. On this point this Court has said the following:
“In construing constitutional provisions where the meaning may be questioned, the court should have regard to the *409 circumstances leading to their adoption and the purpose sought to be accomplished. Kearney v Bd of State Auditors [189 Mich 666, 673; 155 NW 510 (1915)].”
A third rule is that wherever possible an interpretation that does not create constitutional invalidity is preferred to one that does. Chief Justice Marshall pursued this thought fully in Marbury v Madison [5 US (1 Cranch) 137, 175; 2 L Ed 60 (1803)], which we quote in part:
“If any other construction would render the clause inoperative, that is an additional reason for rejecting such other construction . . . .”
These are the principles we must apply when interpreting our state constitution.
The first and second principles stated in Traverse City Sch Dist greatly help in answering the question presented in this case. Under those rules, we are to set aside the “technical rules of statutory construction” and the quest for “dark or abstruse meaning” in favor of the interpretation that “reasonable minds, the great mass of the people themselves,” would give the state constitution. Without question, that exercise must be carried out in light of the whole document. Further, it must involve a generous reading of the people’s will, freed of a lawyer’s instinct toward pinched constructions of narrow phrases.
When considered as a whole, the constitution provides various explanations of, and restrictions on, the legislative process. A broad examination of the provisions of article 4 evidences that the framers and the people placed an extremely high value on the integrity and accountability of this process. There, the constitution prohibits the Legislature from playing deceptive games in the course of enacting legislation,[4] and *410 further seeks to assure that legislation is given meaningful consideration before it is adopted.=[5] Article 4 also notes the special nature of appropriations bills.[6] Finally, the reserved role of the people is noted in article 4,[7] as well as in other provisions of the Constitution. See Const 1963, art 2, § 9; art 12, § 2.
*411 In light of these provisions and the overall approach to legislation taken by the constitution’s framers and the people who ratified it, I am convinced that the Court of Appeals correctly decided this case. I am confident that the constitutional right of referendum, in this narrow context, should not be taken away by so transparent an artifice. Justice Cooley’s “great mass of the people” would, if asked, surely suppose that “acts making appropriations for state institutions,” which deny the people’s reserved power of referendum, are general appropriations bills containing substantial grants to state agencies. Those grants would have to ensure the viability of the agencies or, as the Court of Appeals put it, support the agencies’ “core functions.” 246 Mich App 82; 630 NW2d 376 (2001). The people of Michigan, I am certain, never intended to authorize the 2000 lame-duck Legislature’s legerdemain.
Additionally, the third principle stated in Traverse City Sch Dist provides further support for this conclusion. That principle is that when possible, we must prefer an interpretation that does not create a constitutional invalidity over an interpretation that does.[8]
*412 The referendum power, of course, is the people’s reserved check on the Legislature. In Kuhn v Dep’t of Treasury, 384 Mich 378, 385, n 10; 183 NW2d 796 (1971), this Court, ironically, referred to the referendum power as a “gun-behind-the-door to be taken up on those occasions when the legislature itself does not respond to popular demands.” However, with its decision in this case, the majority removes the people’s check, taking the gun from behind the door and handing it to the Legislature. By holding that the money inserted into 2000 PA 381 circumvents the people’s reserved referendum power, the majority holds that the referendum power exists at the Legislature’s pleasure. Whenever the Legislature wants to avoid the people’s check on its power, it need only insert some money into a bill, apparently even a de minimis amount, to get around that power. The people’s check on the Legislature will thus become invalid because the people will only have the “gun-behind-the-door” when the Legislature gives it to them. Such an interpretation is certainly at odds with this Court’s commitment to liberally construe constitutional provi *413 sions reserving for the people a direct legislative voice, see Kuhn, supra at 385, but further leaves the people’s reserved referendum power, in a word, useless.
In its short opinion, the majority cites “an unbroken line of decisions of this Court interpreting [the referendum power].” Ante at 366. The line is unbroken because it reflects this Court’s dual commitments to the people’s right to vote on matters of great public significance and to the taxpayers’ right to a state government that maintains responsible and functional taxation and appropriation policies. At times, the latter commitment has required that we give effect to the constitutional insulation against referring appropriations measures and related financial enactments. Never, though, has the “unbroken line” veered in the direction approved in this case.
Also, I find it as inevitable as night following day that the concurrences would characterize the lengthy, thoughtful majority opinion as “admirably concise,” ante at 368 (Young, J., concurring), and as setting “forth its analysis simply and straightforwardly” and doing so because “the constitutional issue before us is simple and straightforward.” Ante at 391 (Makkman, J., concurring). Yet, as self-evident as the majority believes its result to be, the orchestrated, explanatory concurrences appeared following this dissent. In my view, these serial apologias do nothing to alter the majority’s disembowelment of the public’s constitutionally guaranteed right to referendum.
So, despite the constitutional structure and the people’s desire for a check on the Legislature, the majority concludes that the Legislature can decide when the people will have that check. I reiterate that rea *414 sonable minds may differ about the underlying substance of this case. Some say public safety and ordinary social intercourse will be disturbed by a radical switch in state concealed weapons policy, while others say that public safety will be enhanced when responsible citizens can carry weapons. I say, and do not believe reasonable minds can dispute, that the constitution says that the people must be allowed to vote.
Kelly, J., concurred with Cavanagh, J.

 The many concerned citizens on both sides defy easy description. To oversimplify, the background dispute over the place of weapons in our society pits firearm advocates and persons interested in hunting against a coalition of law enforcement, religious, and educational interests.
In his concurrence, Justice Young characterizes my observations as a “generous” statement of my own “extensive personal views” of the “political issue” underlying this case. Ante at 368-369 (Young, J., concurring). While he is certainly correct that this “political issue” is not before the Court, his conclusion that I have somehow aired my views of the matter is baffling. This dissent merely states that the underlying matter, which led to the referendum drive, is significant and that thoughtful people may disagree about it. If that is a “generous” statement of my “extensive personal views,” then apparently Justice Young is equally copious about the matter, see id,., and one can only wonder what Justice Young would conclude about Justice Markman’s generosity. See ante at 395 (Markman, J., concurring) (“For what it is worth, I am in complete agreement that 2000 PA 381 is a matter of ‘great public significance’ and can easily appreciate why its opponents wish to malee it the subject of a referendum”).

 Because of its timing, the lame-duck session is understood to be a period of diminished public accountability. See, e.g., Farber & Frickey, Public choice revisited, 96 Mich L R 1715, 1729 (1998).

 Various Michigan legislators would agree with intervening defendant. For example, protesting the new law, Senator Byrum stated that “we know that the only reason there was an appropriation . . . was to block the referendum, block the people’s right to disagree with the action of their Legislature,” 2000 Journal of the Senate 2125, and Senator Gast said that the appropriation “was put in to make it bulletproof and ballot-proof, and I think it’s kind of deceptive.” White, Lawyers, guns and money: weapons petitions go to court, Grand Rapids Press, June 10, 2001 at A18. Similarly, Representative Wojno stated that “the reason that the proponents of this legislation added this appropriation ... is inappropriate and insidious. They apparently believe that in doing so they can circumvent Article II, Section 9 of the Michigan Constitution, and silence the voices of the majority of the people of this State,” while Representative Jellema added that the eleventh-hour addition of the appropriation “further diminishes the right of voters to express their views on this very important issue.” 2000 Journal of the House 2682, 2683.

 Const 1963, art 4, §§ 24 and 25, provides this protection, stating:
*410 No law shall embrace more than one object, which shall be expressed in its title. No bill shall be altered or amended on its passage through either house so as to change its original purpose as determined by its total content and not alone by its title.
No law shall be revised, altered or amended by reference to its title only. The section or sections of the act altered or amended shall be re-enacted and published at length.

 Const 1963, art 4, § 26, provides this assurance, stating:
No bill shall be passed or become a law at any regular session of the legislature until it has been printed or reproduced and in the possession of each house for at least five days. Every bill shall be read three times in each house before the final passage thereof. No bill shall become a law without the concurrence of a majority of the members elected to and serving in each house. On the final passage of bills, the votes and names of members voting thereon shall be entered in the journal.

 This is Const 1963, art 4, § 31, which provides:
The general appropriation bills for the succeeding fiscal period covering items set forth in the budget shall be passed or rejected in either house of the legislature before that house passes any appropriation bill for items not in the budget except bills supplementing appropriations for the current fiscal year’s operation. Any bill requiring an appropriation to carry out its purpose shall be considered an appropriation bill. One of the general appropriation bills as passed by the legislature shall contain an itemized statement of estimated revenue by major source in each operating fund for the ensuing fiscal period, the total of which shall not be less than the total of all appropriations made from each fund in the general appropriation bills as passed.

 Article 4, concerning the legislative branch, notes the people’s power:
Any bill passed by the legislature and approved by the governor, except a bill appropriating money, may provide that it will not become law unless approved by a majority of the electors voting thereon. [Const 1963, art 4, § 34.]

 The Court cited Marbury v Madison in support of this principle. See Traverse City Sch Dist, supra at 406. Although Marbury is sometimes cited for the proposition that the construction of a statute that creates a constitutional invalidity is disfavored, see, e.g., Council of Organizations & Others for Ed About Parochiaid v Governor, 455 Mich 557, 570; 566 NW2d 208 (1997), in the passage this Court cited, Chief Justice Marshall actually was addressing invalidating constitutional provisions. Council of Organizations, as well as Traverse City Sch Dist, supra at 406, and House Speaker v Governor, 443 Mich 560, 585; 506 NW2d 190 (1993), quoted this passage from Marbury.
If any other construction would render the clause inoperative, that is an additional reason for rejecting such other construction, and for adhering to the obvious meaning. [Id. at 175.]
*412 The “clause” referenced, though, was a clause of the United States Constitution, as illustrated by the United States Supreme Court’s language preceding the quoted passage:
It cannot be presumed that any clause in the constitution is intended to be without effect; and therefore such construction is admissible, unless the words require it. [Id. at 174]
Marbury then discussed how US Const, art III, § 2, ¶ 2 provided for the Supreme Court’s jurisdiction, and how no construction of any clause in that section that rendered any other clause inoperative would be favored. See Marbury, supra at 175-180. Traverse City Sell Dist also dealt with giving meaning to the language of the constitution, not saving a statute from constitutional invalidity. See Traverse City Sch Dist, supra at 412-413. Likewise, in this case we must give meaning to, and not invalidate, the people’s reserved referendum power.