No. 15,657.

HALL ET AL. *v*. CITY AND COUNTY OF DENVER ET AL. SPENCER ET AL. INTERVENERS.

(177 P. [2d] 234)

Decided December 26, 1946.

Mr. CLIFFORD W. MILLS, Mr. GEORGE F. DUNKLEE, Mr. EDWARD V. DUNKLEE, for plaintiffs in error.

Mr. MALCOLM LINDSEY, Mr. CARL C. HEARNSBERGER, Mr. PAUL A. HENTZELL, for defendants in error.

Mr. HENRY A. HICKS, Mr. H. ALLYN HICKS, JR., for interveners.

Mr. CHARLES M. ROSE, Mr. BEN S. WENDELKEN, amici curiae.

*En Banc.*

MR. JUSTICE JACKSON delivered the opinion of the court.

PLAINTIFFS in error sought a restraining order enjoining defendants from selling block No. 208, Denver, com-

monly known as the "old courthouse square," and a judgment declaring and adjudicating said square to be a public park. The trial court dismissed the cause and ordered judgment entered in favor of defendants and against plaintiffs for costs, to reverse which the latter bring the case here by writ of error.

Defendants, admitting that the city is proceeding to sell, answer it is under authority of a duly-passed city ordinance. Interveners allege that they have "submitted their certain sealed bid or contract to purchase said property," and that the mayor of Denver, acting in pursuance of a city ordinance, accepted said bid or contract for sale and purchase of the property, and that they are ready, able and willing to comply with the terms and conditions thereof.

The contentions of plaintiffs in error, urged in the trial court and here, are: (1) That Denver cannot legally sell block 208 because it is a public park or square; (2) That a sale of block 208 would be the granting of a franchise, and therefore contrary to section 4, article XX of the Colorado Constitution; (3) That a vote of the people is necessary before block 208 can be sold, because in 1921 they had defeated an initiated charter amendment creating a building commission with power to sell said block. The specifications of points include these three propositions and we deem it proper to pass on all of them, if the judgment of the trial court is to be affirmed.

1. Is block 208 a public park? In 1875 the board of county commissioners of Arapahoe county, after rejecting a site on the corner of Larimer and Fourteenth streets as not being "adequate to the future needs of said county," purchased block 208, East Denver, for the purpose of erecting a county courthouse thereon. No legislative authority then existed giving counties the right to purchase lands for a park. A courthouse was subsequently constructed on this block. In 1902, by amendment to the state Constitution, the City and County of Denver was created out of a part of the old

county of Arapahoe; at that time block 208 passed to the newly formed city and county and the courthouse thereon became that of said City and County of Denver. The annual report of the park commissioner for 1905 does not include block 208 in the list of park lands. The fact that the park department may later have laid out flower beds, by way of beautifying the grounds surrounding the courthouse, did not, in our judgment, convert the block into a public park.

After the completion of the new city and county building in 1932, the City and County of Denver took steps looking toward the disposal of block 208. The board of county commissioners had previously, in 1926, authorized the mayor to receive offers to purchase the old courthouse property. A sign, requesting bids for block 208, was placed thereon in 1932 and remained there until about January 1, 1934. The 1933 report of the city auditor contains the statement that block 208 "will be landscaped, beautified and cared for as a park until such time as the land can be sold by the city and county at a reasonable figure." In October 1934 Mayor Begole, in a letter, states: "This beauty spot is but temporary and must be sold, if and when possible, to apply on retirement of new Court House bonds." Although there is a statement of Mayor Begole that in January 1934 "the property was taken from the commissioner of supplies, who has charge of public grounds and buildings appropriations, and passed over to the manager of parks and improvements," the record shows an invoice, dated January 16, 1935, in which the parks department asks reimbursement from the public grounds and buildings department for Christmas decorations on block 208, and auditor McNichols testified that no parks money had been expended on block 208. The evidence showed that at the end of 1934 a special budget was set up under the commissioner of supplies for block 208, in which manner the matter has been handled ever since. Block 208 never was laid out as a park by the park com-

mission. It was assessed like other non-park property to raise money for the acquisition of park lands. It would appear, therefore, that during the seventy-one years from the time when the property was first bought for a courthouse site it has been uniformly treated first, as a site for the courthouse up to the year 1932, and thereafter as real estate to be disposed of as soon as a satisfactory price could be obtained. At no time was it treated as a park.

It is contended that, during the eleven years between the razing of the old courthouse in 1934 and the commencement of this litigation, block 208 has been used by the public as a park, and that such user has converted the block into a park. This contention is at variance with our ruling in *Starr v. People,* 17 Colo. 458, 30 Pac. 64, where we held that mere user without acts or declarations indicating an offer to dedicate cannot be sufficient to vest a roadway in the public, unless continued for a period of time prescribed by the statute of limitations. Since the old courthouse building was removed in 1934 there has been neither, (a) a charter dedication of the land as a park; nor (b) a user by the public for the period provided by the statute of limitations; nor (c) a common-law acceptance of an offer to dedicate.

We conclude, therefore, that block 208, from the time it was purchased by the county of Arapahoe in 1875, never has been a public park in the legal acceptance of that term, and that therefore section 86 of the charter of the City and County of Denver, which provides: "No portion of Congress park, or of any other park now belonging to or hereafter acquired by the city and county, shall be sold or leased at any time," is not applicable and does not act as a bar to the sale of the block.

2. Plaintiffs in error also rely upon that portion of section 4, article XX, Colorado Constitution, reading as follows: "No franchise relating to any street, alley or public place of said city and county [of Denver] shall be granted except upon the vote of the qualified tax-

paying electors." They contend that this proposed sale is the granting of a franchise, prohibited by the foregoing provision, and cite *Baker v. Denver Tramway Co.*, 72 Colo. 233, 210 Pac. 845, and *Denver & Swansea Ry. Co. v. Denver City Ry. Co.*, 2 Colo. 673. These cases pertain to the granting of a special privilege in highways which the public is continuing to use. But in the instant case we have a property which never was dedicated to the public use, as is a public street. This property, which in the meanwhile has served its purpose, the city now proposes to sell, just as it had bought it some seventy years earlier in its proprietary capacity. This it may do. *Fussell v. Forrest City*, 145 Ark. 375, 224 S.W. 745, quoting from McQuillin on Municipal Corporations. It has been held that, "Where a city is empowered to build a new city hall, and the money which can be realized from a sale of its old hall will be of material aid to it in so doing, it ought to have power to sell its old hall for that purpose, and we are aware of no good reason for holding that it has not." *Marshall v. Mayor of City of Meridian*, 103 Miss. 206, 60 So. 135. Also to like effect is *Carter v. City of Greenville*, 175 S.C. 130, 178 S.E. 508. In another similar case, *City of Williamsburg v. Lyell*, 132 Va. 455, 112 S.E. 666, the court said: "It is manifest that the lot in question was held by the city in its private capacity and has never been dedicated to public uses, and that the city has full power and authority to lease or sell the same." *McIntyre v. El Paso County*, 15 Colo. App. 78, 61 Pac. 237, is not applicable here because in that case, as the court said: "It is conceded in their argument, by counsel on both sides, that there was a dedication of the square to public use, and that it is sufficiently pleaded."

We conclude that the quoted portion of section 4, article XX, Colorado Constitution is no bar to the sale of block 208.

3. It is further contended that, even though the city has the power to sell block 208, such a sale must be authorized by the voters of the City and County of Den-

ver, without which the city council has no such authority. This contention is based upon the fact that section 272 of the Denver charter contains a provision that, "No ordinance defeated by a vote of the people shall be re-enacted or passed by the council," and that in 1921 a measure was submitted to the voters of Denver which provided for the creation of a building commission. This proposed commission would have authority, among other powers, to sell block 208. This measure was defeated by the electorate by a vote of 7,784 for and 32,302 against. It is argued that ordinance No. 29, passed by the council in 1945, authorizing the sale of block 208 by the city to the interveners is, in effect, a re-enactment of the 1921 measure, and therefore is barred by the quoted portion of section 272 of the Denver charter, supra. Reliance also is placed upon that part of section 5, article XX of the Colorado Constitution, reading as follows: "No charter, charter amendment or measure adopted or defeated under the provisions of this amendment shall be amended, repealed or revived, except by petition and electoral vote."

It would appear from an examination of sections 272 and 273 of the Denver charter that the former applies to ordinances that have been referred by voluntary action of the city council to the electorate for approval or disapproval, and the latter pertains to measures that have originated through the use of the initiative, in which case the action of the city council becomes automatic. A reading of ordinance No. 29, series of 1945, will disclose that it originated as an initiated measure by obtaining the signatures of five per cent of the total number of votors in the election district. It further appears that it was submitted to the voters, not through the voluntary action of the city council, but as a result of the use of the initiative. Section 273 of the charter provides, inter alia: "No ordinance adopted by vote of the people shall be repealed or amended by the council." Ordinance No. 34, series of 1921, was not adopted by

vote of the people, and therefore it would seem that section 273 of the Denver charter does not apply to this case any more than does section 272.

■ ■ It therefore remains to be decided whether ordinance No. 34, enacted in 1921, is revived by ordinance No. 29, as enacted in 1945, as the word "revived" is used in section 5, article XX of the Colorado Constitution, supra.

The title of ordinance No. 29, series of 1945, reads as follows: "A Bill for an ordinance authorizing the sale of block 208, East Denver, in the City and County of Denver, for not less than the sum of $765,000." The title of ordinance No. 34, series of 1921, is as follows: "A Bill for an ordinance for the submission to a vote of the qualified electors in the City and County of Denver, at an election to be held on the 17th day of May, A. D. 1921, of a certain proposed *amendment to the Charter of the City and County of Denver,* to be known as Section 14 A, *creating a 'Municipal Building Commission,' defining its powers and duties and naming W. A. Hover, Harold W. Moore and Harry C. Davis as the first members of such Commission.*" In accordance with the specific direction in ordinance No. 34, the ballot used by the voters in the election contained the words of the title of the bill that have been italicized. These words were twice printed—the first printing following the words "For An," and the second preceded by the words "Against An." A lined square was printed opposite the words "for" and "against" in which the voter could indicate his choice by marking an X therein.

It will be observed that the titles of the two ordinances are quite dissimilar. There is nothing in the titles, in fact, to indicate that the two measures even deal with the same subject matter in any degree; and nothing on the ballot submitted to the voters in 1921 even intimated that the sale of block 208 was involved. Another striking difference between the two measures is that the title of the 1945 ordinance bears no imprint of

invalidity; whereas that of the ordinance voted down in 1921 shows that it is invalid on its face for the reason that it discloses an attempt to legislate named personnel into office. *People ex rel. v. Stapleton,* 79 Colo. 629, 247 Pac. 1062. Counsel for plaintiffs in error are therefore placed in the position of arguing that the latter ordinance, valid according to its title, revives an earlier ordinance showing a different subject matter and clearly invalid under its title. We do not believe that this situation is embraced in the term "revived," which may be defined as bringing back to life an object that has become moribund.

It is argued, however, that, although the titles of the two ordinances are different, the measures themselves contain somewhat the same subject matter, in that there is a provision in both for the sale of block 208. An examination of the 1921 ordinance discloses that of its eleven subdivisions nearly all are given over to the rights, duties and powers of the proposed building commission and its relation to various officers of the city administration. Subdivision 3, in enumerating the powers of the commission, contains, inter alia, the following:

(a) "To devise and adopt a plan and method for the erection of a new municipal building or buildings * * *;

(b) "To fix and determine a site for the erection of such building * * *;

(c) "To exercise the power of Eminent Domain * * * whenever necessary;

(d) "To sell the present Court House building and the block bounded by Fifteenth and Sixteenth Streets and Tremont Street and Court Place, *in the event the Commission shall decide on a different location for a new building or buildings,* * * *;

(e) "To remodel the present City Hall building at Fourteenth and Larimer Streets, or to construct a new building on the site of the present City Hall * * *."

There follows a recitation of other powers which normally would be corollary to those above mentioned. Subdivision 9 contains the provision that: "If this charter amendment is authorized by a majority of the qualified electors, of the City and County of Denver voting thereon, then the acquiring of a building site or sites, *and the sale of the present Court House and City Hall properties, or either of them, as may be determined upon and made by the Municipal Building Commission,* is hereby expressly authorized * * *."

It is contended that the sale of block 208 is the principal subject matter of the 1921 ordinance, and that therefore the 1945 ordinance is an attempt to revive it. We do not approve this line of thought for two reasons: first, because we regard the matter of the sale of block 208 in the 1921 ordinance as merely an incident to the main purpose of creating a building commission, as the name implies, for the purpose of obtaining new, larger and more adequate municipal buildings. It will be noted from the portions of subdivisions 3 and 9 of the 1921 ordinance that have been italicized that, although the building commission was given authority to sell block 208 by the ordinance, it was not directed or compelled to do so. In fact, in adopting subdivision 9, it was contemplated that block 208 might be retained and the city hall property at Fourteenth and Larimer streets sold; or that the block might be sold and the old city hall site retained. A third possibility was that both properties might be retained. But whether to sell or not was left to the discretion of the commission, whose first object was (a) "To devise and adopt a plan and method for the erection of a new municipal building or buildings * * *." The second reason why we do not agree with counsels' argument is that if the principal matter in the 1921 ordinance was the sale of block 208, as contended, then there is a variance between the title of the ordinance and its subject matter, and the 1921 ordinance would therefore violate section 21, article V of the Colo-

rado Constitution. In other words, we are asked to hold the 1945 act unconstitutional because it revives the 1921 ordinance; but the only way the 1945 measure could properly be so construed would be to place an interpretation on the 1921 ordinance that would make it also unconstitutional. This would be just the reverse of the approved procedure in construing statutes, i. e., to hold them constitutional if possible. We are not inclined to hold that a later ordinance revives an earlier one which, because of two fatal prenatal defects, has never been brought into being.

But even if the legal sufficiency of the earlier ordinance were unquestioned, we still do not believe there would be a revivor as contemplated by the Colorado Constitution. This point seems to be here first presented for judicial decision in this state. The cases in other jurisdictions appear, without exception, to hold that the prohibition lies against the reenactment or revivor of the particular ordinance or measure, and not against all legislation on the subject matter thereof. The test laid down in *State ex rel. v. Meining*, 133 Minn. 98, 157 N.W. 991, was, "Is the ordinance for violation of which Megnella was imprisoned *different in any essential features* from the ordinance against which the referendum petition was filed?" (italics ours). In *In re Statham*, 45 Cal. App. 436, 187 Pac. 986, the rule is laid down that unless the second ordinance is so plainly an attempt to evade the referendum, that it can be so determined as a matter of law, the prohibition against revivor does not apply. In *Ginsberg v. Kentucky Utilities Com.*, 260 Ky. 60, 83 S.W. (2d) 497, an ordinance approving a loan agreement between a city and the United States Government for a federal loan of $328,000, to be secured by six per cent revenue bonds, to provide for a municipally owned electrical system was prevented from being carried into effect by injunction. The city council thereupon passed an ordinance similar to the first in essential details, but reducing the amount of revenue bonds to be issued to

$262,000 and lowering the interest rate from six to four per cent. The second ordinance was upheld, the court saying: the council "may legislate on the *same subject matter* provided it acts in good faith and not with a purpose to evade the referendum and providing further that the new ordinance differs in essential features from the old one." The court in *McBride v. Kerby,* 32 Ariz. 515, 260 Pac. 435, reached the same conclusion, saying: "We think there can be no escape from the conclusion that the reference is of the specific measure and nothing more." In *Utah Light & Power Co. v. Ogden City,* 95 Utah 161, 79 P. (2d) 61, it was held that the filing of a referendum petition against a city ordinance does not "prohibit a new contract or ordinance remedying defects or objections made to the suspended contract and ordinance."

In the foregoing cases the similarities between the second measure, and the first, claimed to have been revived, were much more striking than those between the two measures involved in the instant case. To adopt the theory urged by counsel for plaintiffs in error would make it possible, over a period of time, for a small percentage of the electorate to place on a ballot by petition a series of measures on various subject matters, and so framed as to turn the majority vote against them, and thereby remove from the field of legislative action by the council large and important subjects of legislation.

Both on principle and authority we are of the opinion: that ordinance No. 29, series of 1945, does not operate as a revivor of ordinance No. 34, series of 1921; and that the City and County of Denver, acting through its council, has the power to sell block 208.

 Whether the action of the council in executing the agreement here under investigation was, under the circumstances, for the best interests of the city, is not a question properly to be determined by this court. Our duty is not to pass upon the wisdom of legislation, but to determine its legal sufficiency, if and when the mat-

ter is presented for our consideration. In the instant case, we hold that the ordinance in question is valid.

The judgment is affirmed.

Mr. Justice Burke and Mr. Justice Hilliard dissent.

Mr. Justice Luxford does not participate.

Mr. Justice Hilliard dissenting.

This is a suit in equity, involving the authority of the city council of the City and County of Denver to make sale of block 208 East Denver, otherwise known as the "Old Court House Square." The council, proceeding on the theory of its authority, and in form, passed an ordinance, presently to be stated, made sale of the property to Spencer and Iserman, the interveners herein. The ordinance provided that the "terms of sale shall be fixed by the mayor and council," but in truth the purchasers, not the mayor and council, proceeding after the passage of the ordinance, fixed the terms thereof, as will appear from their formal bid, with their "terms and conditions attached" thereto, which will also be set forth at an appropriate place in this opinion. Plaintiffs in error, appearing as "residents, citizens and taxpayers" of Denver, challenge the council's authority in the premises, contending variously. Although other points urged by them are not without merit, in the interest of brevity I confine my discussion to two contentions emphasized by the complaining taxpayers. The first is that the property involved is a "Park" and may not be sold (Denver Charter, 1927 Compilation, article III, section 86); and the second is that an ordinance known as No. 34, series of 1921, passed May 2, 1921, and approved the following day, but defeated by the people, considered in the light of section 5, article XX, Colorado Constitution, and section 272, article XVII, Denver City Charter, so operates as to make void any authority theretofore existing in the council to make sale and disposition of the property

in question. The trial court resolved against the tax-payers.

1. Much might be said in support of the claim that the property is a park. Always, in a large sense, the courthouse property has been enjoyed as public ground by the people generally. Its central location and accessibility, its shade trees, public benches and comfortable seats, its fountains and flowers, gladdened the hearts of lovers of the beautiful and the weary in quest of brief respite. Not only were these privileges the portion of our own residents, but they were the delight of tourists from every land. What was true for many decades before the stately old court house became inadequate, and was razed, for more than one decade thereafter, and with increased tempo, that delightful spot, which bears every outward appearance of a park, was used by the people as such. Moreover, with relation to the rest of the city it is situated where in many cities a comparable park, the boast of residents and the toast of visitors, is maintained. So, although, as I conceive, we might well, and soundly, have resolved that the property involved was a park, and not subject to sale, as we have seen, still, out of respect to the views of my brethren, I refrain from a more extended presentation of the point. In connection therewith, however, I venture the comment that the council was not proceeding under legal mandate—it was not required to take action opposed to the not unreasonable conception that the property is a park.

2. That by operation of the action of the people in 1921, the council had lost the right to make sale of the property involved seems clear. In exposition thereof, I will review the record generally, and quote some documents in extenso. Before doing so, however, I call attention to article XX of the Constitution, by authority of which the "City and County of Denver" became, and is, existent, and of the Denver Charter adopted pursuant to that article of the Constitution. "No charter, charter

amendment or measure adopted or defeated under the provisions of this amendment," reads the Constitution, "shall be amended, repealed or revived, except by petition and electoral vote." Art. XX, §5, Const. "No ordinance defeated by a vote of the people," says the Denver Charter, "shall be reenacted or passed by the council." §272, Denver Charter. By the several action of the council and the people in 1921, as none may deny, an ordinance contemplating several things, including the sale of the property involved, was enacted by the council, but was rejected by the people. The author of the court's present opinion, Justice Jackson, referring to the sale feature of the ordinance, says it was "merely an incident to the main purpose of creating a building commission," while in an earlier opinion in this same case written by Justice Burke, he said, "It occurs to us as more reasonable to conclude that all other provisions of the measure were in fact mere incidents to that contemplated sale." Regardless of the relative importance of the two features of the ordinance emphasized by Messrs. Justices Jackson and Burke, and I subscribe to that of the latter, all must agree that by the ordinance of 1921, the sale of the property involved was presented to the people and rejected. That, I submit, resulted in bringing to bear the inhibition provisions of both the Constitution and the Charter, already quoted. In connection with the sale proposed in 1921, it is important, I think, to call attention to the fact that in that ordinance it was specifically provided that sale of the property involved should be for not less than one million dollars. Also, that in 1933, at the depth of economic depression, the Denver Real Estate Exchange valued the property at one million two hundred thousand dollars, and the city auditor's report for the same year gave the value at one and one quarter million dollars. Yet, in 1945, when valuations of all real estate had increased to heights never before known, and were continuing to soar, this property, the most desirable in Denver, was

to be sold, at first, as is common knowledge, for $750,-000, but finally, the increase not being due to the efforts of the council, the price was fixed at $818,600. Why, in times of unequalled prosperity, highest valuations and a lively market, should this choice property be sold for the price indicated? In addition to the fact that the council is powerless to sell the property at all, as I believe, there is such manifest absence of good faith in this effort to despoil the public of one of its prize possessions, for a moiety of its value, that a court of equity may not give it countenance. But, say some of the propagandists, the sale price is of passing importance—the public should think of the vast sums the New York purchasers have committed themselves to expend in improving the property, and of other incidental advantages "assuredly" to result therefrom. Witness these sample bits of misinformation widely published by authority of an organization that ignores the record. Addressing itself to those who oppose the sale, this organization observes: "Is it that the price offered for this property is too small, even when we take into account the firm commitment by the reputable and successful realty firm of Webb and Knapp to improve this property by the erection of a building to cost approximately 6 million dollars?" The propagandists continue: "Is it assumed that the investment of 6 million dollars of eastern capital in Denver would be detrimental to the interests of this, the natural center of the Rocky Mountain Empire? Will the taxpayers of Denver benefit or suffer from the sale of this property, which sale will add immediately approximately $800,000 to the city treasury and, in the future, tax revenue on a 6 million dollar structure?" Let it be noted that the purchasers, experienced and shrewd above many, and guided by counsel of recognized ability, were careful to have the contract reduced to writing. The "writing" consists of an ordinance passed by the council, and the purchasers' bid, including the precise terms and conditions thereof. I quote them in or-

der, as follows: "Be it Enacted by the Council of the City and County of Denver:

"Section 1. The sale of Block 208, East Denver, in the City and County of Denver, Colorado for the net price of not less than Seven Hundred and Sixty-five Thousand Dollars is hereby authorized.

"Section 2. The terms of the sale shall be fixed by the Mayor and the Council but in no event shall the payment of the final installment be deferred longer than the expiration of six months from the date when the proper government official, or officials, certifies that the materials necessary to construct the improvement or improvements to be erected by the purchaser on said property are no longer needed for war purposes and are available to the general public.

"Section 3. Subject to the conditions herein set out, sales shall be made to such person, persons, corporation or corporations as shall offer terms and conditions most beneficial to the City and County of Denver in the opinion of the Mayor and the Council.

"Section 4. Good and sufficient deed of conveyance shall be executed to the purchaser upon the completion of the payment of the purchase price and the property shall be free and clear from all liens and encumbrances except liability to be assessed for the Moffat Tunnel Improvement District and liability to be assumed for general taxes accruing after the payment of the final installment of the purchase price. The said deed shall be executed by the Mayor and attested by the Clerk and Recorder under the corporate seal of the City and County of Denver.

"Section 5. The City and County of Denver shall furnish the purchaser with an abstract of title to said property, certified to date by an abstract company doing business in said City and County.

"Section 6. In the opinion of the Council, this ordinance is necessary for the immediate protection and preservation of the public health, safety, convenience

and general welfare, and it is enacted for that purpose and shall be in full force and effect immediately after its passage and final publication."

"Passed by the Council June 11, 1945, and signed and approved by the Mayor June 13, 1945.

"June thirteenth, 1945

"Hon. Benjamin F. Stapleton,
Mayor City and County of Denver,
City and County Bldg.
Denver,
Colorado.

"Dear Mayor Stapleton:

"We hereby bid the sum of Eight Hundred Eighteen Thousand Six Hundred Dollars ($818,600.00) for Block Two Hundred Eight (208) East Denver, City and County of Denver, State of Colorado, in accordance with the terms and conditions attached hereto.

"A certified check for Twenty Thousand Dollars ($20,000.00) has been heretofore lodged with you and is now in your possession, and is a deposit on this specific bid.

"Spencer and Iserman
"By H. A. Hicks, Jr.,
"B. B. Harding,
"Their Agents and Attorneys-in-fact."

The Attached

"Terms and conditions
for sale of
Block 208, East Denver

"Price

"The purchase price shall be not less than $792,000.

"Terms of Payment

"$20,000 of the purchase price is payable immediately

and an additional $80,000 within twenty days after the effective date of the ordinance authorizing the sale.

"The final payment shall in no event be deferred longer than the expiration of six months from the date when the proper government official or officials, certifies that the materials necessary to construct the improvement or improvements to be erected on said property are no longer needed for war purposes and are available to the general public.

### "Improvements

"Within two years after materials are available, as set forth in the terms hereinbefore mentioned, the purchasers will proceed with the erection of improvements on said land at a cost in excees of one million dollars, or will pay the sum of $25,000 annually for the privilege of delaying construction.

"This provision shall be binding upon all grantees of the purchasers and in case the ownership of said property is split up, then the cost of the aggregate improvements on said property shall be in excess of one million dollars.

### "Conveyance of Property

"The purchaser will be furnished with an abstract of title certified to date of closing by an abstract company doing business in the City and County of Denver.

"On the completion of the payment of the purchase price a good and sufficient deed of conveyance shall be executed to the purchasers. The property shall then be free and clear from all liens and encumbrances except assessment for Moffat Tunnel special improvements and assessments for general taxes accruing after the payment of the final installment of the purchase price.

"The deed shall be executed by the Mayor and attested by the Clerk and Recorder under the corporate seal of the City and County of Denver.

"Assignability of Contract

"The contract of purchase may be assigned whereupon the assignee shall replace the purchaser under the contract.

"Remedies in Case of Breach of Contract

"If any installment of the purchase price is not paid when the same should be paid hereunder (time being of the essence), all prior payments shall be retained by the seller as liquidated damages in full, and both parties be relieved from this contract.

"If the title to the property be not merchantable, then all prior payments of purchase price made to the seller shall be returned, and both parties be relieved from this contract."

Considering the foregoing, and proceeding but briefly, I think it pertinent to observe as follows: First of all, that the purchasers are Spencer and Iserman, not Webb and Knapp. However responsible the latter gentlemen may be, not disclosed, they have not contracted to do anything whatever in this matter; secondly, that the cost of improvements to be made on the property is not "six million dollars," but simply in excess of one million dollars; thirdly, that the promise is not to pay the purchase price "immediately," but at the rate of not less than $50,000 annually, which means that the purchasers, at their option, may make the final payment fourteen years hence, and meanwhile the property is not to be taxed; fourthly, that when the final payment shall have been made, and other conditions are met, the purchasers still have two years of grace within which to commence to improve the property; fifthly, that even then, by the payment of $25,000 annually, they may postpone making improvements indefinitely; sixthly, that the contract is subject to divisible assignments, and should there be resort thereto, then not one majestic improvement to cost one million dollars shall constitute the requirement, but the total sum to be expended by the several as-

signees for improvements of their individual choosing, must be not less than one million dollars. In short, the alleged contract fairly appraised, the purchasers have a most favorable option on choice property, in relation to which, considering the evident great value thereof, they have promised nothing of moment, and risked very little.

Not only do I think the constitutional and charter provisions quoted herein, operate to defeat the contract of the purchasers' reliance, but in the adoption thereof the people were farseeing and wise in the day thereof. I decline to have part in voiding these public safeguards.