2013 COA 177

**FRIENDS OF DENVER PARKS, INC.; Renee Lewis; David Hill; Shawn Smith; John Case; Judy Case; Steve Waldstein; and Zelda Hawkins, Plaintiffs–Appellants,**

v.

**CITY AND COUNTY OF DENVER; Denver School District No. 1; and Debra Johnson, Clerk and Recorder for the City and County of Denver, Defendants–Appellees.**

Court of Appeals No. 13CA1249

Colorado Court of Appeals, Div. A.

Announced December 26, 2013

* Sitting by assignment of the Chief Justice under provisions of Colo. Const. art. VI, § 5(3), and

§ 24-51-1105, C.R.S. 2012.

Benson & Case, LLP, John Case, Denver, Colorado, for Plaintiffs–Appellants.

Michael Hickman, Molly Ferrer, Jerome DeHerrera, Denver, Colorado, for Defendant–Appellee Denver School District No. 1.

Douglas J. Friednash, City Attorney, David W. Broadwell, Assistant City Attorney, Patrick A. Wheeler, Assistant City Attorney, Mitch T. Behr, Assistant City Attorney, Denver, Colorado, for Defendants–Appellees City and County of Denver and Debra Johnson.

Opinion by JUDGE BERNARD

¶ 1 How does land in the city of Denver become a park? This appeal requires us to look at that question through two lenses: (1) Denver's charter; and (2) common law principles concerning the dedication of property to particular uses, such as parks. Once we have viewed the case through those lenses, we must then decide which one controls our analysis.

¶ 2 If a city's charter provides no guidance on a legal issue, courts look to the common law. Colorado, like many other states, recognizes a common law doctrine that governs the dedication of lands to public uses such as parks. If a city communicates an unequivocal intent to set aside land as a park by its conduct, this doctrine dedicates the land as a park. The city does not have to take formal action. In other words, *if* a city's charter does not expressly state or clearly imply otherwise, then the city may dedicate land as a park by its conduct.

¶ 3 This appeal requires us to decide whether the Denver city charter makes such an express statement or clear implication. We conclude that it does.

¶ 4 In this case, the city of Denver, the defendant, agreed to transfer a parcel of land, which we shall call "the southern parcel," to a school district so that the district could build a school on it. The city passed an ordinance to accomplish the transfer. Plaintiffs, an organization called Friends of Denver Parks, Inc., and some additional persons, believed that the southern parcel was a park, and they opposed the transfer. They took two courses of action.

¶ 5 First, plaintiffs tried to file a referendum petition with the city's clerk and recorder. They wanted to repeal the ordinance transferring the southern parcel, and they contended that the city's charter required the city to hold an election to determine whether the voters—as opposed to the city's government—would authorize the transfer. The clerk refused to accept the petition.

¶ 6 Second, plaintiffs filed a motion for a preliminary injunction to enjoin the city's transfer of the southern parcel to the school district. Plaintiffs contended that the southern parcel was a park, and they asked the court to prevent the city from transferring the southern parcel until the court could decide whether the city's charter authorized the city to transfer it to the school district. Plaintiffs also argued that the court should order the city's clerk to accept their referendum petition and to schedule an election to determine whether the city's voters would authorize the transfer.

¶ 7 The court denied both requests, and plaintiffs appealed. We affirm because we conclude that the pertinent law and the record support the trial court's determination

that plaintiffs did not have a reasonable likelihood of success on the merits of the issues that they raised.

## I. Background

### A. Procedural History

¶ 8 This appeal concerns some undeveloped land that the city owns in southeastern Denver. This land is roughly triangular; South Havana Street and East Girard Avenue border its southern tip.

¶ 9 In the spring of 2013, the city decided to divide this land into two parcels. First, it agreed to trade the southern parcel that is the focus of this appeal, plus about $700,000, to a school district in exchange for a building on a commercial plot in another part of town. The school district plans to build a school on the southern parcel. The city intends to use the school district's building on the commercial plot as a center to assist victims of domestic violence. (As is pertinent to this opinion, the positions of the city and the school district are congruent.)

¶ 10 Second, the city attached the northern parcel of the tract to Paul A. Hentzell Park, which is located to the north of the northern parcel.

¶ 11 The city council passed ordinances to effect the trade of the southern parcel to the school district and to attach the northern parcel to Paul A. Hentzell Park.

¶ 12 Plaintiffs submitted a referendum petition to the city's clerk and recorder. It requested that the city hold a vote to repeal the ordinance that approved the trade. The clerk rejected the petition. Plaintiffs obtained over 6,600 signatures and resubmitted the petition. The clerk rejected the petition again, adding that the law did not authorize plaintiffs to obtain the signatures.

¶ 13 Plaintiffs filed this lawsuit. They asserted two theories to support their claim that the city could not trade the southern parcel to the school district: (1) the city's conduct over the years had dedicated the southern parcel as a park under the common law; and (2) the city's charter requires that voters approve the transfer of a "park belonging to the city as of December 31, 1955."

¶ 14 The city replied that (1) although the southern parcel "belong[ed] to the city," it was not considered or treated as a "park" as of December 31, 1955; and (2) the city's charter does not permit land to be dedicated as parks under the common law.

¶ 15 The trial court held three hearings on plaintiffs' request for a preliminary injunction. The first covered two days in mid-June 2013, and the plaintiffs and the city presented testimony and other evidence to the court.

¶ 16 The court held the second hearing at the end of June 2013. Plaintiffs and the city provided the court with legal argument. The court then orally denied plaintiffs' request for a preliminary injunction because it concluded that there was not a reasonable probability that they would succeed on the merits of their claims. The court issued a written order to that effect at the beginning of July 2013.

¶ 17 The trial court held a third hearing in September 2013, and it denied plaintiffs' request for a stay pending appeal. The court reaffirmed its decision to deny plaintiffs' request for a preliminary injunction.

¶ 18 A motions division of this court denied a stay pending appeal. We expedited the briefing in this appeal so that we could decide it before the school district breaks ground on the southern parcel in early 2014 to begin the process of building the school.

### B. The Evidence

¶ 19 Our review of the record indicates that the following facts the parties presented at the two-day June 2013 hearing are undisputed.

¶ 20 In 1936, the city acquired 36.45 acres of land through which Cherry Creek flows. The southern parcel that the city proposes to transfer to the school district is a 10.77–acre piece of this larger tract. The southern parcel is the southernmost piece of the original tract, and it abuts part of the eastern border of the Hampden Heights subdivision.

¶ 21 The city acquired the entire tract by deed. The deed does not restrict how the city may use the tract.

¶ 22 The city acquired the tract to control flooding along Cherry Creek, but the tract was not within the city limits when the city acquired it. The city later annexed the entire tract, and all the land that made up the tract is now within the city limits.

¶ 23 The city did not develop or otherwise use the southern parcel between 1936 and the late 1960s. During this time, some people had walked or had ridden their horses across it for recreational purposes, some people had picnics on it, and some people had used part of it as a dump for trash.

¶ 24 The city has not passed any ordinances that designate the southern parcel as a park.

¶ 25 A developer built the Hampden Heights subdivision in the late 1960s. When a person was deciding whether to buy a house in the subdivision in 1976, a member of the city's planning department told him that the southern parcel was land in a park, and gave him a 1967 brochure that identified the southern parcel as a proposed "public open park." The city had published the brochure to reflect its revised comprehensive plan. The prospective purchaser decided to buy the house, relying on this statement.

¶ 26 In 1979, a resident of the Hampden Heights subdivision complained that the northern and southern parcels had become an eyesore. The resident wondered whether the city could maintain the parcels better or sell them to someone who would build a home there. The city's mayor responded in a letter that budget constraints limited the city's ability to maintain the parcels. But he added that the parcels would "eventually ... be developed into a park," and the city could not sell them "because [they are] dedicated park land."

¶ 27 In 1983, the city passed an ordinance that dedicated land north of the northern parcel as Paul H. Hentzell Park. This land was not part of the original tract that the city had obtained in 1936.

¶ 28 In 1992, the manager of the city's parks and recreation department sent a memorandum to the city's director of asset management. The parks manager stated that it was his "understanding, with the con-currence of ... the [c]ity [a]ttorney ... that the [southern parcel] ... is not a dedicated park." He stated that his understanding was "based on the fact that there is no park dedication ordinance and the [southern parcel] was not used as a park ... when all parks were dedicated by charter."

¶ 29 In 1997, the city passed an ordinance that defined "city park land" as any "land, waterways and water bodies, owned, operated, or controlled by the department of parks and recreation." The department of parks and recreation controls and manages the southern parcel. City ordinance section 39–192(a) states that "the manager of [the department of] parks and recreation has the power ... to adopt rules and regulations for the designation and preservation of natural areas contained within ... city park land."

¶ 30 The manager of the parks and recreation department designated the southern parcel as a "natural area" in 2007. Under a Denver city ordinance, a designation of land as a "natural area" is not the same as designation of land as a park in the city's charter.

¶ 31 A person who had worked for the parks and recreation department for twenty years thought that the department intended to restore the southern parcel's native grasses and plants. To promote this goal, the city grazed goats on the southern parcel at one time to eat invasive weeds and to trample the seeds of native grasses into the soil.

¶ 32 But the manager also designated portions of the southern parcel as rights-of-way for city streets that abutted the parcel. And in the 1990s the city developed the two southernmost acres of the southern parcel at the intersection of South Havana Street and East Girard Avenue as a parking lot, which it leased to a private company. The city later stopped using and maintaining the parking lot, and it erected a gate to block the parking lot entrance.

¶ 33 As of the date of the June 2013 hearing, several maps on the city's website labeled the southern parcel as "Hampden Heights North Park" or that represented that the southern parcel was a park by the maps' color-coding. These maps include the city's floodplain map, zoning map, neighbor-

hood map, police and fire map, land use map, parks and recreation map, and street map.

## II. Sufficiency of the Trial Court's Order

¶ 34 As a preliminary matter, plaintiffs argue that the trial court's order denying their preliminary injunction request does not contain adequate findings of fact and conclusions of law. We disagree.

¶ 35 C.R.C.P. 52 requires that "in granting or refusing interlocutory injunctions the court shall ... set forth the findings of fact and conclusions of law which constitute the grounds of its action." Findings and conclusions may be either written or oral. *See Hipps v. Hennig,* 167 Colo. 358, 364–65, 447 P.2d 700, 703 (1968); *Esecson v. Bushnell,* 663 P.2d 258, 261 (Colo.App.1983); *Nat'l State Bank of Boulder v. Burns,* 525 P.2d 504, 505–06 (Colo.App.1974). Oral findings and conclusions that are contained in a transcript are adequate if they are "sufficiently comprehensive to provide a basis for review." *Hipps,* 167 Colo. at 364–65, 447 P.2d at 703.

¶ 36 The court announced its decision orally at the end of the late-June 2013 hearing. It then instructed the city to prepare a brief written order summarizing its decision. In early July 2013, the court signed and issued the written order that the city had submitted.

¶ 37 We conclude from reviewing the transcripts of the late June 2013 and September 2013 hearings that the court discussed all of plaintiffs' contentions with both parties, and that it then expressly rejected them. The transcript is therefore "sufficiently comprehensive to provide a basis for review." *Hipps,* 167 Colo. at 364–65, 447 P.2d at 703.

## III. Legal Principles That Govern Our Review

### A. Standard of Review

¶ 38 A trial court's decision to deny a request for a preliminary injunction is an appealable interlocutory order. C.A.R. 1(a)(3). "The granting or denial of a preliminary injunction lies within the sound discretion of the trial court and will not be reversed by an appellate court absent an abuse

of discretion." *Litinsky v. Querard,* 683 P.2d 816, 817 (Colo.App.1984); *Am. Television & Commc'ns Corp. v. Manning,* 651 P.2d 440, 443–44 (Colo.App.1982). A trial court abuses its discretion when its decision to grant or deny a preliminary injunction is based on an "erroneous application of the law" or is "otherwise manifestly arbitrary, unreasonable, or unfair." *Bloom v. Nat'l Collegiate Athletic Ass'n,* 93 P.3d 621, 623 (Colo.App.2004). If evidence in the record supports the trial court's findings, we will conclude that the trial court did not abuse its discretion in granting or denying the motion, *id.* but "[w]here the issue under review on appeal concerns only legal, as opposed to factual, questions, however, a [preliminary injunction ruling] is subject to independent review on appeal," *Evans v. Romer,* 854 P.2d 1270, 1274 (Colo.1993); *Bd. of Cnty. Comm'rs. v. Fixed Base Operators, Inc.,* 939 P.2d 464, 467 (Colo.App.1997).

### B. Preliminary Injunctions

¶ 39 The decision to grant or to deny a request for a preliminary injunction is not an adjudication of the parties' ultimate rights in a controversy, and our review of such a decision does not address these ultimate issues. *Litinsky,* 683 P.2d at 819; *Fixed Base Operators, Inc.,* 939 P.2d at 467. The purpose of a preliminary injunction is to prevent irreparable harm pending the final determination of a cause. *City of Golden v. Simpson,* 83 P.3d 87, 96 (Colo.2004). Injunctive relief against a branch of government "should be granted sparingly and with full conviction ... of its urgent necessity." *Fixed Base Operators, Inc.,* 939 P.2d at 467.

¶ 40 A party requesting a preliminary injunction must satisfy a six-part test. *Rathke v. MacFarlane,* 648 P.2d 648, 653–54 (Colo. 1982) (setting forth six factors that must be met for a preliminary injunction to issue). The single factor that is pertinent to this appeal is whether plaintiffs showed that there was a reasonable probability that they would succeed on the merits of their contentions. *Id.*; *Bloom,* 93 P.3d at 628; *Iowa Nat'l Mut. Ins. Co. v. Cent. Mortg. & Inv. Co.,* 708 P.2d 480, 483 (Colo.App.1985). The determination of whether there is a "reason-

able probability of success on the merits" requires that the trial court "substantively evaluate the issues as it would during trial." *Dallman v. Ritter*, 225 P.3d 610, 621 (Colo. 2010) (internal quotation marks omitted).

## C. Interpretation of the City's Charter

¶ 41 A municipal charter is the equivalent of a statute or other legislation. *See Londoner v. City & Cnty. of Denver*, 52 Colo. 15, 32, 119 P. 156, 162 (1911) (equating "charter" with "statute"); *see also* Black's Law Dictionary 250, 1448 (8th ed. 2009) (defining "statute" as a "law passed by a legislative body; specif., legislation enacted by any lawmaking body, including legislatures, administrative boards, and municipal courts"; and defining "charter" as an "instrument by which a municipality is incorporated, specifying . . . its highest laws").

¶ 42 When we interpret a municipal charter, such as the one here, we apply the same rules that we use when interpreting a statute. *Leggett & Platt, Inc. v. Ostrom*, 251 P.3d 1135, 1141 (Colo.App.2010). Our primary goal is to give effect to the charter's intent, and we do so by looking to the charter's plain language. We consider that language in the context of the entire charter, and "we must give effect to the ordinary meaning of the language." *Id.* We must, if possible, read the charter as a unit, construing each provision "consistently and in harmony with the overall statutory design." *Id.*

¶ 43 If we conclude that the language in a section of the charter is clear and that we can discern the city's intent in enacting the section with certainty, then we do not resort to other rules of statutory interpretation. And we defer to the interpretation of the municipal agency charged with administering the section "unless that interpretation is inconsistent with the legislative intent manifested in the text" of the charter. *Id.*

¶ 44 When statutory law and common law interact, we recognize a legislative body's "authority to modify or abrogate common law, but [we] can only recognize such changes when they are clearly expressed." *Vigil v. Franklin*, 103 P.3d 322, 327 (Colo. 2004). We construe such statutes strictly.

*Id.* If a legislative body wants to " 'abrogate rights' " that the common law provides, " 'it must manifest its intent either expressly or by clear implication.' " *Id.* (quoting *Vaughan v. McMinn*, 945 P.2d 404, 408 (Colo.1997)).

¶ 45 Our review of the trial court's interpretation of a charter's language is de novo. *Leggett & Platt, Inc.*, 251 P.3d at 1140.

## D. Common Law Dedication of Land

¶ 46 "In Colorado a dedication of land to public use may be made either according to the common law or pursuant to statute." *City & Cnty. Of Denver v. Publix Cab Co.*, 135 Colo. 132, 139, 308 P.2d 1016, 1019–20 (1957). Common law dedication occurs when the city's "unambiguous actions" demonstrate its "unequivocal intent" to set the land aside for a particular public use. *State Dep't of Highways v. Town of Silverthorne*, 707 P.2d 1017, 1020 (Colo.App.1985); *accord City of Northglenn v. City of Thornton*, 193 Colo. 536, 539, 569 P.2d 319, 321 (1977); *City of Denver v. Jacobson*, 17 Colo. 497, 500, 30 P. 246, 247 (1892); 11A Eugene McQuillin, *Municipal Corporations* § 33:32, at n. 6 (3d ed. rev. vol. 2009) (intent need not actually exist, but rather must appear to exist).

¶ 47 One of the public uses for which a city may dedicate land under the common law is as a park. *See McIntyre v. Bd. of Cnty. Comm'rs*, 15 Colo.App. 78, 61 P. 237 (1900) (recognizing the doctrine of common law park dedication); *see also Hall v. City & Cnty. of Denver*, 115 Colo. 538, 542, 177 P.2d 234, 236 (1946) (applying the doctrine). In *Hall*, our supreme court applied the rule of common law dedication to city-owned land. The court found that there was no "commonlaw acceptance of an offer to dedicate" land as a park. 115 Colo. at 542, 177 P.2d at 236. In reaching this conclusion, the court relied on *Starr v. People*, 17 Colo. 458, 30 P. 64 (1892), which held that the public's use of a road through private property did not turn the road into a public highway unless the property owner's statements and conduct indicated that he intended such a result.

## IV. Analysis

¶ 48 The city contends that two sections of its charter abrogate any common law rule that would limit a city's ability to transfer its real property. The city submits that Denver Charter section 2.4.5 sets forth the sole mechanism as of December 31, 1955, for (1) creating parks; and (2) transferring parks. It states:

> Without the approval of a majority of those registered electors voting in an election held by the City and County of Denver, no park or portion of any park belonging to the City as of December 31, 1955, shall be sold or leased at any time, and no land acquired by the City after December 31, 1955, that is designated a park by ordinance shall be sold or leased at any time.... No land acquired by the City after December 31, 1955, shall be 'deemed a park unless specifically designated a park by ordinance.

¶ 49 The city further contends that, after December 31, 1955, if it has not designated land as a park under the mechanism established by section 2.4.5, then that plot of land is not a park. And, if the plot of land is not a park, then Denver Charter section 3.2.6 authorizes the city to sell or transfer it without following the requirements of section 2.4.5. Section 3.2.6 states:

> The Council shall have the additional powers to approve or disapprove, by ordinance or resolution, leases or other instruments selling or granting the use of City-owned property to other parties, and certain contracts, under the following conditions:
>
> . . . .
>
> (C) ....All contracts providing for the sale or conveyance of real property owned by the city ... shall be authorized by the Denver City Council acting by ordinance or resolution.

¶ 50 Based on our de novo analysis of the city's contention, we agree. We therefore conclude, for the following reasons, that the trial court did not abuse its discretion when it determined that plaintiffs did not establish a reasonable likelihood of success on the merits of this issue. *See Bloom,* 93 P.3d at 623.

¶ 51 First, the city has not passed an ordinance dedicating the southern parcel as a park, and therefore the second part of section 2.4.5 does not apply.

¶ 52 Second, the record supplies little support for plaintiffs' contention that the southern parcel was a park on or before December 31, 1955. The only evidence that plaintiffs presented at the preliminary injunction hearing concerning the southern parcel's use during that period was that people had ridden their horses or had walked across the southern parcel, and that they sometimes had picnics on it. There is little evidence in the record describing the city's conduct concerning the southern parcel between when it was acquired in 1936 and when the pertinent sections of the charter became effective on December 31, 1955. The record did not therefore provide a basis to support a determination by the trial court that the city's "unambiguous actions" established its "unequivocal intent" to dedicate the parcel as a park before December 31, 1955. *See City of Northglenn,* 193 Colo. at 539, 569 P.2d at 321; *Hall,* 115 Colo. at 542, 177 P.2d at 236; *Jacobson,* 17 Colo. at 500, 30 P. at 247; *Town of Silverthorne,* 707 P.2d at 1020.

¶ 53 Third, we conclude that the explicit language of the pertinent sections of the city's charter make clear that, as of December 31, 1955, the city intended (1) to eliminate the concept of common law dedication of parks; (2) for land that the city owned as of that date; (3) that had not already been dedicated as a park by such means.

¶ 54 After conducting our de novo review, applying the plain language of these provisions, and reading them together, *see Leggett & Platt, Inc.,* 251 P.3d at 1140–41, we conclude that the drafters of section 2.4.5 intended to draw two temporal boundaries. The first boundary concerns how city land can become a park. Section 2.4.5 makes clear that it does not matter how city land became a park before December 31, 1955. But city land can only become a park after that date if the city designates it as a park by an ordinance.

¶ 55 The second boundary concerns how the city can sell or transfer parks. After December 31, 1955, the city can only sell or

transfer parks if the city's voters approve the sale or the transfer.

¶ 56 Section 3.2.6 broadly states that the city, through "ordinance or resolution," "authorize[s]" all contracts for "the sale or conveyance of real property owned by the city." In other words, if property is not a park, then the city may transfer it without the approval of the city's voters.

¶ 57 When we read the plain language of sections 2.4.5 and 3.2.6 together, we conclude that the charter's drafters intended to draw a bright line. It did not matter to the drafters how land became a park before December 31, 1955. But the drafters intended to limit that process for all land that the city owned after that date. They stated that dedication by ordinance was the sole method by which city land could become a park.

¶ 58 The drafters further intended to limit how the city could sell or transfer parks that existed before December 31, 1955, and those that the city dedicated as parks by ordinance after that date. They stated that there was only one method to effect such a sale or transfer: approval by the city's voters. But the drafters also clearly stated that they did *not* intend to place that limitation on sales and transfers of city land that was not a park before December 31, 1955, and that the city had not dedicated as a park by ordinance after that date.

¶ 59 The city's interpretation of sections 2.4.5 and 3.2.6 is consistent with the clear legislative intent in the text of those sections. We therefore defer to the city's interpretation. *See Leggett & Platt, Inc.*, 251 P.3d at 1141.

¶ 60 In doing so, we construe these sections strictly to the extent that they abrogate the concept of common law dedication. But even analyzing those sections from this legally conservative vantage point, we conclude that the city has expressed, or at least clearly implied, such an intent. *See Vigil*, 103 P.3d at 327.

¶ 61 Fourth, even assuming for purposes of argument that the doctrine of common law dedication could apply to the southern parcel after December 31, 1955, we conclude that the trial court did not abuse its discretion when it determined that plaintiffs did not establish that they were likely to succeed on the merits of this issue. The evidence in the record is conflicting whether the city intended to dedicate the southern parcel as a park.

¶ 62 On the one hand, evidence in the record supports plaintiffs' argument that the city intended to dedicate the southern parcel as a park. This proof includes

- the 1976 statement by a member of the city's planning department to a prospective purchaser of a house in the Hampden Heights subdivision that the southern parcel was a park;

- the mayor's 1979 statement that the city could not sell the northern and southern parcels because they were "dedicated park land"; and

- the maps on the city's website that, as of the date of the June 2013 hearing, labeled the southern parcel as "Hampden Heights North Park" or that represented the parcel as a park by color-coding.

¶ 63 On the other hand, other evidence supports the city's argument that the city did not unequivocally intend to dedicate the southern parcel as a park. This proof includes

- testimony that the city's purpose for purchasing the tract in 1936, of which the southern parcel is a part, was to control flooding along Cherry Creek, not to turn the tract into a park;

- the 1967 brochure that identified the southern parcel as a *proposed* "public open park," which indicates that the city did not consider the southern parcel to be a park when it printed the brochure;

- the mayor's 1979 statement that the northern and southern parcels would "eventually ... be developed into a park," which indicates that the mayor thought that the parcels were not yet a park;

- the 1992 memorandum from the manager of the city's parks and recreation depart-

ment that stated that both he and the city attorney "underst[ood]" that the southern parcel was not a park because (1) the city had not passed an ordinance dedicating the southern parcel as a park and (2) the southern parcel had not been used as a park "when all parks were dedicated by charter";

- the city's development of two acres at the southern tip of the southern parcel as a parking lot that it leased to a private commercial entity, which indicates that the city did not consider the southern parcel to be a park; and

- the 2007 designation by the manager of the city's parks and recreation department of the southern parcel as a "natural area" under a city ordinance, which is not the same as a designation of land as a park under the city's charter.

¶ 64 The record thus does not clearly establish that the city, through its *unambiguous* actions, had demonstrated an *unequivocal* intent to dedicate the southern parcel as a park. *See City of Northglenn*, 193 Colo. at 539, 569 P.2d at 321; *Hall*, 115 Colo. at 542, 177 P.2d at 236; *Jacobson*, 17 Colo. at 500, 30 P. at 247; *Town of Silverthorne*, 707 P.2d at 1020.

## V. Referendum Petition

¶ 65 Plaintiffs submitted their referendum petition to repeal the city's ordinance that approved the transfer of the southern parcel to the school district to the city's clerk and recorder. The clerk rejected plaintiffs' petition because (1) the approval of a real estate contract is an administrative action; and (2) she stated that she was not authorized to accept petitions concerning repeal of administrative actions.

¶ 66 Like Colorado's Constitution, Denver's charter reserves to its citizens the power of referendum for purposes of "requir[ing] that existing ordinances be referred to a vote of the electorate." Denver Charter § 8.3.1. Citizens initiate referendum proceedings by filing affidavits of five registered voters who will serve as the petitioner's committee with the county clerk. Denver Charter

§ 8.3.2(A). This committee is responsible for circulating and filing the referendum petition. *Id.* Before the committee can circulate the petition, the city's clerk and recorder must review it "for a determination of compliance with ... any and all other applicable State or City and County laws." *Id.* at § 8.3.2(C). If the clerk rejects the petition, he or she must make written findings specifying the defects in the petition. *Id.*

¶ 67 The committee may challenge the clerk's decision in court. *Id.* And the court may determine whether the petition "exceeds the proper sphere of legislation and instead attempts to exercise administrative or executive powers." *Vagneur v. City of Aspen*, 2013 CO 13, ¶ 33, 295 P.3d 493 (internal quotation marks omitted); *City of Idaho Springs v. Blackwell*, 731 P.2d 1250, 1253 (Colo.1987).

¶ 68 "Neither the referendum nor initiative powers guaranteed by the Colorado Constitution grant the people the right to petition for an election on administrative matters." *Blackwell*, 731 P.2d at 1253; *accord Vagneur*, ¶ 36. Whether a proposed referendum is administrative or legislative in nature is a "case-by-case inquiry." *Vagneur*, ¶ 48. "[G]overnment decisions to enter into a contract with a specific entity are not legislative decisions because they do not involve the adoption of generally applicable rules in the implementation of public policy." *Id.* at ¶ 47. And "the sale ... of a particular parcel of city-owned property" is not the adoption of a "city-wide zoning plan of general applicability." *Id.* at ¶ 60.

¶ 69 Plaintiffs argue that their proposed referendum is legislative in nature because the ordinance that they seek to repeal constitutes a permanent change in land use policy and is a de facto zoning change. We are not persuaded. A single contract for the transfer of a single piece of land does not repeal or amend any parts of the city's charter, and it is not binding on decisions that the city may make about other pieces of land. *See id.* at ¶ 60 ("We reject [the] suggestion that proposing a permanent change in use of a

specific parcel of [c]ity-owned open space is equivalent to modifying a zoning plan and that such a proposed change in use is therefore legislative."). The transfer in this case does not "involve the adoption of generally applicable rules in the implementation of public policy." *Id.* at ¶ 47.

¶ 70 We conclude for the foregoing reasons that the trial court did not abuse its discretion when it concluded that plaintiffs had not established a reasonable likelihood of success on the merits of this issue. *See Bloom*, 93 P.3d at 623.

¶ 71 The order is affirmed.

JUDGE RICHMAN and JUDGE BOORAS concur.